IRA BARROWS *vs.* LUTHER V. BELL.

The publication, by a member of the Massachusetts Medical Society, of a true account of the proceedings of that society in the expulsion of another member for a cause within its jurisdiction, and of the result of certain suits subsequently brought by him against the society and its members on account of such expulsion, is privileged; although it speaks of the expelled member as "the offender," and remarks that "the society has vindicated its action in this case, and its right to act in all parallel cases."

Under a declaration which alleges the publication of a certain "libel concerning the plaintiff," but contains no innuendoes, colloquium or special averments of fact to connect the publication with the plaintiff, if no evidence is offered to connect him therewith, except the publication itself, the question, whether the publication refers to the plaintiff, is for the court, and not for the jury.

ACTION OF TORT for a libel. Writ dated March 1854. The declaration contained two counts, in one of which "the plaintiff says, the defendant caused to be published, of and concerning him, in a certain magazine called the Boston Medical and Surgical Journal, a false and malicious libel, a copy whereof is an-

nexed;" and in the other, "that he is a physician, and practising in his profession as such, and that the defendant caused to be published, of. and concerning the plaintiff, in his profession as aforesaid, in a certain magazine called the Boston Medical and Surgical Journal, a false and malicious libel, a copy whereof is annexed." The copy annexed is printed in the margin.*

* THE SUITS AGAINST THE MASSACHUSETTS MEDICAL SOCIETY.

We presume that our readers will be gratified to learn that a final *quietus* has been made to the legal proceedings against the medical society, consequent upon the expulsion of Dr. Ira Barrows, of Pawtucket.

It will be recollected that Dr. B. was presented to the counsellors by a district society, as having incurred their disciplinary functions in consequence of his alleged fraudulent transactions in a business negotiation with Dr. Benoni Carpenter. The council, after the usual hearings, recommended to the general society, in conformity with the statutes, the expulsion of the offender. Further hearings were had before the society at its meetings in Worcester and Boston, and a vote of expulsion was made by more than the two thirds required. The usual minute of the proceedings in the premises, extracted from the secretary's records, was published in the annual transactions and distributed to the members.

The party expelled commenced an action for a pretended libel contained in these transactions, against Dr. Storer of Boston, as having made the motion for his expulsion, and Dr. Carpenter who seconded it, and laid his damages at $10,000. He also simultaneously initiated a process by writ of *mandamus*, intended to require his replacement in membership, as having been illegally and wrongfully ejected.

The medical society, considering that the gentlemen against whom the action for damages was commenced had only acted in common with the great majority of its members, and had been placed in the position of defendants without any individual fault or wrong on their part, at once, and by a unanimous vote, assumed the responsibility of the defence. A committee, consisting of Dr. Bell of Somerville, Dr. Jacob Bigelow of Boston, and Dr. Mackie of New Bedford, was appointed, and full powers conferred upon them to see that the society was defended in both proceedings.

The suit for libel came on at the term of the supreme court at New Bedford, more than a year since, before Fletcher, J. After a portion of the evidence as to publication, &c., was given to the jury, the court expressed doubts whether the words charged were libellous and actionable, and directed the proceedings to be stayed, until the opinion of the full bench could be obtained on that essential point. A decision of the court has just been made, ordering the plaintiff to be *nonsuited*, no libel having been found to exist. The writ of *mandamus*, in the

Barrows *v.* Bell.

The answer admitted the publication ; but denied that the article was libellous, false or malicious, and alleged that the first

---

mean time, had been argued and dismissed as untenable, Judge Shaw pronounc ing the opinion of the court.

Here ends, as we suppose, all further litigation. The society has vindicated its action in this case, and its right to act in all parallel cases. Although the pro tection of a power incidental to the very existence of a corporation for such purposes as are set forth in its charter has required a pretty heavy draft upon its funds, and has been accompanied at times with a good deal of feeling in con sequence of the *homœopathic* relations into which the subject was forced by the friends of the plaintiff, we cannot believe that, after the immediate sensibilities of those incidentally interested in the contest shall have become calmed, there will remain any division of judgment as to the duty of the society's having acted as it has done in the premises.

We think the impression of those by no means few members, who avowed that the day had gone by in which it was of any use to endeavor to exercise those rights of selfprotection, originally implied in the charter ; that it was even ques tionable whether *female* practitioners could be *kept out* of its organization, except at the hazard of *mandamus* and penal inflictions ; will be changed by the results of these legal contests. The recent amendments of the by-laws, found to be necessary to meet the cunning fence of a class of *quasi* regular, or rather rene gade physicians, who had in early life been members, but had left the respectable career in which they started, for shorter paths to money and employment, will awaken new hopes in the minds of those who had begun to despair at the inert ness and impotence of the society, that they will not be always obliged to sit by and hold communion with the priests of empiricism around the very altars and in the very temples of medical science !

The class of Thomsonian, eclectic and nostrum-vending boasters of skill in cur ing, who had insisted on retaining membership into which they had originally been received, escaped the penalties of the by-laws, by declaring that they dealt in no nostrums. O no ! not they ! they would be very happy to show their dis trict societies, or any committee of them, the sworn recipes from which their high sounding panaceas were compounded. They never had kept their nostrums secret, but felt it was time enough to announce their composition, *when asked to do it*, which they had not before been !

A few such pettifogging defences, which certainly met the demand of the mere words of the law, satisfied every intelligent mind, that the arts and tricks of the quack were now, as they had been in ages past, so sinuous and crafty that they could only be met and put down by looking beyond the mere words of a statutory provision. A by-law, predicated on the necessary assumption that there was a well understood tone and standard of professional feeling in all honorable physi tians, which could not be, in every possible case, provided for in words, anv

part of the publication, as far as the words "as it has done in the premises," (at the end of the sixth paragraph,) was a true and correct statement of the official proceedings of the medical society and of the lawsuits brought against them, and that the defendant, as one of the committee appointed to defend those suits, caused the publication to be made, as he believed he had a right to do ; and further alleged that no part of the publication, after the words above mentioned, related to the plaintiff, or was connected with him, or with said cases, and averred that it concerned other cases and practices, and other persons than the plaintiff.

---

more than that a precise index of what constitutes "gentlemanlike" or "officer-like" behavior can be laid down in the *law martial*, has been incorporated into a code, which, as is expected, will cover the thousand retreats of empirics, accidentally in a membership retained for fraudulent and deceptive purposes.   The recent decisions of our highest tribunal, we repeat, may well give new courage to those who have lost faith in the disposition of courts, legislatures, and other high authorities, to sustain the regular profession.   Year after year have adventurers in new schemes of medical education hung about the general court, to obtain the privilege of applying to their graduating neophytes a title of M. D., *without* any additional symbol of its origin.   These solicitors announce in pompous arrogance to the committees, that *their* systems of medical education are vastly higher ; and when asked the naturally suggested question : "If your system is so much superior, why are you willing and anxious to confound its pupils with the lower, old-fashioned method ?" they can only reply, "that the community has a false idea that the *degree* of M. D. without any designation of Thomsonism, eclecticism, &c. &c., is quite respectable, and hence their pupils will go to some Philadelphia eclectic concern, if denied here at home!"   These very pretenders could give no higher proof of the general standing and respect of the profession, secured by long years of service before the community, than in their unwearied pertinacity to dupe the legislature into allowing them to apply a *false trade mark to their crude and fraudulent imitations.*

The Massachusetts Medical Society has stood the brunt of one after another of these onslaughts.   When successive legislatures—comprising some of avowedly progressive proclivities—and the highest judicatures, fully sustain its efforts to keep a noble profession in that elevated position in which the fathers of our commonwealth recognized it in the charter they granted, its members need have no apprehension that they have fallen upon radical and reckless times.   We congratulate our associates upon the occasion of their having full and complete vindication.

At the trial before *Metcalf*, J., the plaintiff proved the publication and the extent of the circulation of the journal, and rested his case.

The defendant proved the proceedings had respecting the plaintiff by the medical society, of which the following is the material part:

At a meeting of the councillors of the society, "Doctor Carpenter moved the following votes: Resolved, That all homœopathic practitioners are, or should be, denominated irregular practitioners, and, according to the by-laws of this society made and provided, ought to be expelled from membership.

" Resolved, That Ira Barrows, of Norton, now a member of this society, ought to be, and by a vote of this society is, expelled from membership, for the following reasons: 1. For being guilty of dishonorable conduct. 2. For being the maker and vendor, at sundry different times, of certain and several quack medicines. 3. For being an irregular practitioner, having adopted the homœopathic, or infinitesimal, or loaf sugar system.

" On motion of Doctor Bigelow, the first resolve was laid upon the table; and on motion of Doctor J. B. S. Jackson, the resolves relative to Dr. Barrows were referred to a committee of three. The committee consisted of Doctors Caleb Swan, of Easton, Randall, of Rehoboth, and Phelps, of Attleborough."

That committee, after notice and hearing, reported to said councillors, as to the " accusation of being guilty of dishonorable conduct," that " the ground of the accusation grew out of a certain bargain between the two gentlemen, wherein Doctor Barrows, for a large sum of money, relinquished his practice to Doctor Carpenter, went out of the State for a year or more, then returned and broke his contract by practising in Pawtucket. This was set forth by Doctor Carpenter in an article published in the Gazette and Chronicle, and admitted by Doctor Barrows to be substantially correct. Your committee consider that had there been any consideration mentioned in the relinquishment, this would be more properly a subject of legal investigation than one of this kind. But, as it is, they are of the opinion that, in a moral point of view, the respondent is guilty of the charge."

26 *

On that report, the councillors, after a hearing of the parties, unanimously recommended to the society the expulsion of Doctor Barrows, " on the ground of gross immorality, in having broken his solemn pledge given to Dr. Carpenter." And the society, after discussion at its meetings at Worcester and at Boston, adopted this recommendation, by a vote of more than two thirds.

The plaintiff admitted that the account given, in the alleged libel, of the legal proceedings consequent upon the expulsion of the plaintiff, was substantially true.

The defendant contended that he was not required to prove the truth of the statements in the residue of the publication, because no reference was made, in terms, to the plaintiff, and no innuendoes connected him with the last part of the publication.

" The judge thereupon called on the plaintiff's counsel to state whether they expected to offer evidence to control the proof offered of the justification, or to connect the plaintiff with the last part of the publication; to which they replied, that they should not offer any evidence, but should contend that the jury might infer that the latter part of the publication did refer to the plaintiff, from the article itself, and the proof already offered.

" The judge then stated to the counsel, that, as the case stood, he should instruct the jury that the plaintiff could not maintain this action, so far as it related to the last part of the publication; and that if the jury were satisfied, upon the evidence, that the other part of the publication was true, the defendant would be entitled to a verdict.

" The plaintiff's counsel contended that the publication itself was a charge by the defendant against the plaintiff of a fraudulent transaction, and that the defendant, in order to justify, must prove to the satisfaction of the jury, that the plaintiff had been guilty of ' a fraudulent transaction in a business negotiation.' But the judge ruled otherwise, and declined to leave it to the jury to say whether the article itself was a charge of a fraudulent transaction."

The jury returned a verdict for the defendant, and the judge reported the case, as above, to the full court.

*C. B. Farnsworth, & R. Mathewson* (of Rhode Island), for the plaintiff. 1. The defence set up in the answer, as to the first portion of the libel, constitutes, if proved, no legal justification of the publication. Proceedings before the Massachusetts Medical Society not being judicial proceedings, the publication of them is not privileged, though the proceedings themselves might be. No report of proceedings, other than judicial or parliamentary, is privileged; and as to those the privilege is subject to very considerable limitations. 1 Stark. Sland. 260. Cooke on Defamation, 48. *Duncan* v. *Thwaites*, 3 B. & C. 556. *M'Gregor* v. *Thwaites*, 3 B. & C. 24. *The King* v. *Fleet*, 1 B. & Ald. 379. *The King* v. *Abingdon*, 1 Esp. R. 226. *The King* v. *Creevey*, 1 M. & S. 273. *Flint* v. *Pike*, 4 B. & C. 476. *Lewis* v. *Walter*, 4 B. & Ald. 613. *Roberts* v. *Brown*, 10 Bing. 519. *Delegal* v. *Highley*, 3 Bing. N. C. 950.

This publication, even if the proceedings were judicial, is not privileged; because it is not full and accurate, and contains none of the evidence, and is mixed up with comments and insinuations. 1 Amer. Lead. Cas. (3d ed.) 186, note to *Howard* v. *Thompson*. *Duncan* v. *Thwaites*, 3 B. & C. 556. *Lewis* v. *Clement*, 3 B. & Ald. 702. *Roberts* v. *Brown*, 10 Bing. 519. *Delegal* v. *Highley*, 3 Bing. N. C. 960. It does not purport to be a report; it is not signed by the writer for the committee, nor addressed to the society, nor published in their organ; but it is an editorial article in a newspaper of general circulation.

2. The first part of the article styles the plaintiff "the offender;" asserts that "the society has vindicated its action in this case, and its right to act in all parallel cases;" alludes to the "feeling in consequence of the homœopathic relations into which the subject was forced by the friends of the plaintiff;" (as if the writer believed him guilty of this charge, whereas the truth was that this complaint was originally entertained by the society, as appears by the original resolutions, and always carried on, because the plaintiff was a homœopathic practitioner;) and closes with suggesting that even the homœopathists themselves, the friends of the plaintiff, after their sensibilities shall have become calmed, will join all others in acquiescing in the justice of the

society's course. These are sufficiently distinct charges that the plaintiff is guilty. *Roberts* v. *Brown,* 10 Bing. 519. *Holley* v *Burgess,* 9 Alab. 728. 1 Amer. Lead. Cas. 155, 156, and cases cited, note to *Van Vechten* v. *Hopkins.*

3. The latter part of the publication is inseparable from the former; and if the one refers to the plaintiff, so does the other. The question, whether the last part of the article referred to the plaintiff, was a fact for the jury to determine. If it referred to the plaintiff, and was written of him, it is obviously libellous, and no innuendoes are necessary to explain it; and the declaration alleges that it was written and "published of and concerning him."

*T. D. Eliot & T. M. Stetson,* for the defendant. 1. The first part of the article was only a true account of certain legal proceedings had in consequence of the plaintiff's expulsion from the medical association. The defendant had been one of a committee appointed to defend the suits. No malice in fact, or special damage, is shown. The publication therefore falls within the class of privileged communications. *Harris* v. *Thompson,* 13 C. B. 333. *Curry* v. *Walter,* 1 Bos. & Pul. 525. *The King* v. *Wright,* 8 T. R. 298. *Toogood* v. *Spyring,* 4 Tyrwh. 582, and 1 Cr., M. & R. 181. Holt on Libel, 270, 271. 1 Stark. Sland. 263. 2 Stark. Sland. 247.

2. The article does not allege that the plaintiff was guilty of the charges on which he was expelled, but only that he had been expelled on those charges. Whether the article alleged that the plaintiff was guilty of those charges was a question of law for the court, and rightly decided. *Curry* v. *Walter,* 1 Bos. & Pul. 525. *Bloss* v. *Tobey,* 2 Pick. 320. *Carter* v. *Andrews,* 16 Pick. 5. *Farnsworth* v. *Storrs,* 5 Cush. 415. *Snyder* v. *Andrews,* 6 Barb. 47.

3. Where an alleged libel does not, upon its face, apply to the plaintiff, there must be an inducement, stating such facts as will show the application of the statement to the plaintiff. 1 Stark. Sland. 383, 392. *Hall* v. *Blandy,* 1 Y. & Jerv. 490. *Adams* v. *Meredew,* 2 Y. & Jerv. 417. *Goldstein* v. *Foss,* 2 Y & Jerv. 146. *Toogood* v. *Spyring,* 4 Tyrwh. 595. *Clement* v

*Fisher*, 7 B. & C. 459. *Andrews* v. *Woodmansee*, 15 Wend. 232. *Miller* v. *Maxwell*, 16 Wend. 9. *M' Claughey* v. *Wetmore*, 6 Johns. 83. *Thomas* v. *Croswell*, 7 Johns. 271. *Baylis* v. *Lawrence*, 11 Ad. & El. 920. *Bloss* v. *Tobey*, 2 Pick. 320. *Goodrich* v. *Davis*, 11 Met. 480. *Carter* v. *Andrews*, 16 Pick. 4. *Snell* v. *Snow*, 13 Met. 281. The *St.* of 1852, *c.* 312, which dispenses with innuendoes, still requires a clear statement of what is necessary to make the words intelligible in the sense in which the plaintiff contends that they were written. See forms annexed to that statute, and note.

SHAW, C. J. The present is an action of tort, brought to recover damage for a publication alleged to be a libel upon the plaintiff, consisting of an article published in the Boston Medical and Surgical Journal, under the direction of the defendant.

The article alleged to be libellous is headed, " The suits against the Massachusetts Medical Society," and it proceeds to give a brief account of the proceedings of the medical society, which resulted in the expulsion of the plaintiff from his membership, for misconduct. It proceeds also to state that several suits have been commenced by the plaintiff against members of the society, for libel, one against the member who made the motion for his expulsion, and one against the member who seconded it. It also states that the plaintiff simultaneously initiated a process by writ of mandamus; that the medical society assumed the responsibility of the defence of these proceedings, and appointed a committee of three for that purpose, of whom the defendant was one. It states that these legal proceedings have all terminated favorably to the society and its members, and comes to the conclusion, " here ends, we suppose, all further litigation," and adds a few concluding remarks, in regard to the powers of the society, and the propriety of exercising them, in the discharge of its duty and the vindication of its rights. The article is then followed by some remarks respecting the character and condition of the society and the medical profession, which the defendant states in his answer have no reference to the plaintiff whatever.

In his answer, the defendant admits the publication, but

alleges that the part of the said publication, which relates to the plaintiff, is a true and correct statement of the official proceedings of the medical society, published for the information of the medical profession, and with no intent to injure the plaintiff. And he alleges that all the other portions of the said publication relate to other persons and subjects, and were not written of and concerning the plaintiff.

On the trial, as appears by the report, the plaintiff proved the publication and the extent of the circulation of the Boston Medical Journal, and there rested.

The defendant then offered evidence to show the course of proceedings before the medical society, and the expulsion of the plaintiff for alleged misconduct, the fact that legal proceedings had been instituted by the plaintiff, as stated in the publication, and that they had been terminated in the manner therein stated.

The question now is in relation to the correctness of the instructions upon this evidence, which the judge who tried the cause announced and proposed to give to the jury. They are thus stated : " The judge thereupon called upon the plaintiff's counsel to state whether they expected to offer evidence to control the proof offered of the justification, or to connect the plaintiff with the last part of the publication ; to which they replied, that they should not offer any evidence, but should contend that the jury might infer that the latter part of the publication did refer to the plaintiff, from the article itself, and the proof already offered."

Upon this point, we think the decision of the judge was correct. The declaration contained no averment of any fact which would affect the meaning of the language, no innuendo pointing any expression or allusion therein made to the plaintiff, and no colloquium alleging that the language was used of and concerning the plaintiff. In the absence of all such averments, we think the ordinary and natural meaning and construction of the language was a question of law for the court; and therefore it was not to be left to the jury, to say whether it was written of and concerning the plaintiff.

In regard to the other point, the judge proposed to instruct the jury, that if they were satisfied on the evidence that the other part of the publication was true, the defendant would be entitled to a verdict.

The plaintiff's counsel contended, that the publication itself was a charge by the defendant against the plaintiff of a fraudulent transaction, and the defendant, in order to justify, must on this trial prove the truth of that charge, that is, prove, by evidence to be offered here, that the plaintiff had been guilty of being engaged in such fraudulent transaction. But the judge ruled otherwise, and declined to leave it to the jury, whether the article itself was a charge of a fraudulent transaction. This last, we think, was quite right; whether the article purported to be a charge of fraud made by the writer upon the plaintiff, or whether it was an allegation that such a charge had been made against the plaintiff before the medical society, was a question of construction, and properly decided as a question of law.

The result then of this charge was, that if the publication, as far as it went, was a true, just and fair statement that such a charge of fraudulent transaction had been made to the medical society against the plaintiff, a member thereof, and determined and decided by them, and this report of the proceedings was made for the proper purpose of informing the medical profession and the public of the result of those proceedings, then it was justifiable, and not libellous. And the question now is, was that direction right? The plaintiff insists that it was not.

The ground now taken by the learned counsel for the plaintiff, that the defence of the first part of the publication, if proved, constitutes no legal justification of the publication, is stated more broadly, and in more unqualified terms, than the authorities of the English common law will warrant. The general rule is, that any statement of wrongs and grievances, made by a party alleging himself injured thereby, though they affect the reputation and credit of another, if made to a tribunal or body having jurisdiction of the subject matter, to inquire into the proceedings and redress the grievance complained of, if found to exist, are not libellous; and that a fair statement of these proceedings

when they have been acted upon and decided, made with an honest view of giving useful information, and where the publication will not tend to obstruct the course of justice and interfere with a fair trial, is not a libellous publication. Most of the cases relied on in the argument are these exceptional cases; as *M' Gregor* v. *Thwaites*, 3 B. & C. 24, where the parties merely went before the magistrate for advice, and he was not called upon to act in his official capacity; and *Duncan* v. *Thwaites*, 3 B. & C. 556, where the publication was of a mere preliminary examination, when a further hearing was ordered. Several other cases turn on the same point, and proceed on the ground that such proceedings are inchoate and *ex parte*, and ought not to be published before the trial, when the party charged has an opportunity to make his defence. The publication of the *ex parte* evidence taken before a coroner was held unjustifiable on the same ground. *The King* v. *Fleet*, 1 B. & Ald. 383.

So in *Roberts* v. *Brown*, 10 Bing. 519, where it was held, that the publication of the defendant was not a true and correct statement of the proceedings, and where such statement was accompanied by libellous remarks of his own, not warranted by the proceedings. But in that same case Mr. Justice Park introduces his opinion by this remark: " I am not prepared to say that reports of proceedings in courts of justice are not to be encouraged as instructive and beneficial to the public; but they must be accurate and fair reports; and it is by no means clear that a party is justified in publishing, without discrimination, every thing that falls from the mouth of counsel."

The case of *Delegal* v. *Highley*, 3 Bing. N. C. 950, was an action for malicious prosecution before a magistrate, and also for libel in publishing an account of the proceedings thereon. In regard to the latter, the court held, upon a plea of justification, that it was bad and insufficient, because it did not state that the publication was a true, full and faithful account of the proceedings in a court of justice, and therefore was not justified by the occasion.

We have stated above that we think the English rule, holding that, to justify the publication, the proceedings must be directly

judicial, or had in a court of justice, is stated too broadly., Ir many cases it has been held that complaints made to a tribuna. or officer, who is supposed to have power to inquire into and redress the grievance, if honestly made, by one having an interest, though such tribunal has no jurisdiction, are not libellous; as in a petition to the king, to parliament, to a board of officers, or the like. *Fairman* v. *Ives*, 5 B. & Ald. 642, was the case of an address by the defendant to Lord Palmerston, secretary at war, against the plaintiff as an officer of the army, setting forth falsehood and dishonorable conduct in the plaintiff in not paying him an acknowledged debt. It was held, that though the secretary at war had no direct power to act, yet if the defendant believed that he could aid him, by his influence, to obtain redress, it would rebut the charge of malice, and render the address not libellous, though otherwise it would be. The doctrine is there fully discussed, and many cases are cited other than proceedings strictly in the course of justice. See also *M'Dougall* v. *Claridge*, 1 Campb. 267, and *Fowler* v. *Homer*, 3 Campb. 294, and the cases cited in the notes to the American edition.

But whatever may be the rule as adopted and practised on in England, we think that a somewhat larger liberty may be claimed in this country and in this commonwealth, both for the proceedings before all public bodies, and for the publication of those proceedings for the necessary information of the people. So many municipal, parochial and other public corporations, and so many large voluntary associations formed for almost every lawful purpose of benevolence, business or interest, are constantly holding meetings, in their nature public, and so usual is it that their proceedings are published for general use and information, that the law, to adapt itself to this necessary condition of society, must of necessity admit of these public proceedings, and a just and proper publication of them, as far as it can be done consistently with private rights. This view of the law of libel in Massachusetts is recognized, and to some extent sanctioned, by the case of *Commonwealth* v. *Clap*, 4 Mass. 163, and many other cases.

A recent case in this commonwealth appears to us to be an

authority in point. *Farnsworth* v. *Storrs*, 5 Cush. 412. It was
a suit by husband and wife against a clergyman for libel, which
consisted in reading a written paper before the church and con-
gregation, being votes previously passed by the church, reciting
that the female plaintiff had been dealt with by the church, found
guilty and ordered to be excommunicated, for alleged unchaste
conduct before her marriage, with the man whom she afterwards
married, being then a member of the church, and refusing to
express any penitence for the crime. Upon a case stating these
facts, the court decided that an action would not lie, on the
ground that churches are voluntary bodies, associated for lawful
and useful purposes; that they are recognized and their priv-
ileges conferred by law, among which is the authority to deal
with members for immoral and scandalous conduct, and punish
them, on conviction, by censure, suspension or excommunica-
tion; that to this jurisdiction every member, by entering into
the church covenant, submits; that these proceedings are *quasi*
judicial, and all those who complain, act and vote thereon, or
pronounce the result, orally or in writing, in good faith, within
the scope of the authority conferred, and not falsely or colorably,
are protected by law.

The Massachusetts Medical Society were not a private asso-
ciation; they were a public corporation, chartered by one of the
earliest acts under the Constitution, which was amended and
their powers confirmed by several subsequent acts. *Sts.* 1781,
*c.* 15; 1788, *c.* 49; 1802, *c.* 123; 1818, *c.* 113.

The charter invested the society, their members and licentiates,
with large powers and privileges, in regulating the important
public interest of the practice of medicine and surgery, enabled
them to prescribe a course of studies, to examine candidates in
regard to their qualifications for practice, and give letters testi-
monial to those who might be found duly qualified. They were
authorized to elect fellows, and vested with power to suspend,
expel or disfranchise any fellow or member, and to make rules
and by-laws for their government. No person could be a mem-
ber, but by his own act in accepting the appointment.

This society was regarded by these legislative acts as a public

institution, by the action of which the public would be deeply affected in one of its important public interests, the health of the people. The plaintiff, by accepting his appointment as a fellow, voluntarily submitted himself to the government and jurisdiction of the society in his professional relations, so long as they acted within the scope of their authority.

The *status* or condition of being a member of this society was one of a permanent character and recognized by law—one in which each member has a valuable interest; and that it was so regarded by the plaintiff is manifest from his effort to obtain a restoration to it by a judgment of this court, by a writ of mandamus.

We think it obvious that the subject matter of the complaint —dishonorable conduct, a fraudulent transaction between the plaintiff and another member of the profession and of the same society—was within the scope of the authority conferred by law on the society; and that the direction of the court, that their action was conclusive upon the plaintiff, was correct. As to the legal proceedings set forth in the supposed libel, it was admitted by the plaintiff's counsel that the account there given of those proceedings was substantially true.

If then this charge of dishonorable or fraudulent conduct by the plaintiff, in his dealings with Dr. Carpenter, was within the jurisdiction of the medical society, and proceedings were instituted and carried on to their final determination in the expulsion of the plaintiff from his fellowship, then the proceedings might be rightly characterized, as in the case of *Farnsworth* v. *Storrs*, as *quasi* judicial; and then the only remaining question of fact was, whether the publication was a true and correct narrative of such proceedings and determination. This question the judge did leave, or proposed to leave, to the jury; with the direction, that if they should find upon the evidence that that part of the publication was true, the defendant would be entitled to a verdict. We are of opinion that this direction was right. As the verdict was for the defendant, we are to assume that it was found by them; or, if the verdict was taken by consent, it would have been found under the instruction that the publication did

present a true and correct narrative of the proceedings before the society, and their determination thereon.

The fact, that these proceedings were considered closed and finished, takes away from this publication the objection, that it would have a tendency to prejudice the public mind and prevent the party affected from having a fair trial.

*Judgment on the verdict for the defendant.*