## Kilian, Appellant, *v.* Doubleday & Co., Inc.

Argued January 12, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

118 

 reargu-
ment refused April 14, 1951.

*Lewis Weinstock,* with him *Conlen, La Brum & Beechwood,* for appellant.

*W. Wilson White,* with him *Thomas Raeburn White, White, Williams & Scott,* and *C. L. Cushmore, Jr.,* for appellee.

OPINION BY MR. JUSTICE HORACE STERN, March 19, 1951:

In this action for libel the jury rendered a verdict in favor of defendant. Plaintiff appeals from the refusal of the court below to grant him a new trial.

This is the way in which the allegedly libelous article came to be written:—At the American University in Washington a course in English was conducted by Don M. Wolfe, the students being disabled veterans of World War II. The course consisted, in part, of the writing by the students of essays or stories about their personal experiences in the war; their compositions would be submitted to Dr. Wolfe, who suggested corrections and revisions. Dr. Wolfe conceived the idea of having these stories published in book form, and, after an original publication by another concern, he entered into a contract with defendant, Doubleday & Company, for that purpose. Each student in the class, 53 in all, contributed at least one article. The book was published under the title "The Purple Testament", and it was advertised in the jacket as consisting of

"the native eloquence of *absolute honesty*", and as constituting "the fragments of their [the authors'] *own intimate experiences*". Some 9000 copies were sold and distributed throughout the United States. Among the articles was one by Joseph M. O'Connell which gave rise to the present suit.

O'Connell was a soldier who had been seriously injured during the course of the Normandy invasion and was hospitalized from August to October, 1944, at a station hospital about 12 miles from Lichfield, England, where there was a large replacement depot. In the original draft of the article which he wrote he narrated incidents said to have occurred at the Lichfield camp and which, he testified at the trial, were described to him by individuals who had allegedly witnessed them. Dr. Wolfe, to whom he submitted the draft several times, stated that he "thought it was interesting, and that it was the first time he had heard about it", but twice returned it with the suggestion that O'Connell should use "more descriptive detail", that he should "make it more vivid", that it "did not have in it the sights, sounds and bits of conversation necessary to make the story readable". The result was that whereas O'Connell had originally written the article in the third person he now wrote it, in order to "make it more vivid", in the first person, purporting that the incidents he narrated occurred under his own personal observation and in his own experience.

The story, as it finally appeared in "The Purple Testament", may be condensed as follows:—I [O'Connell] and my buddy, while being transferred in an ambulance from one hospital to another in England, reached a big army camp near Lichfield. The camp was dreary and ugly; it reminded me of the rotten, filthy German prison camps I had seen in France. As we lay in the ambulance we heard a loud voice outside shout-

ing: "Just let me catch one of you sons o' bitches loaf on this detail and you'll get twenty lashes when you get back tonight." A group of four men came to carry us into the hospital; they were all dressed in blue pants and shirts with a large letter "P" sewed on their clothes. The same loud voice I had heard a few minutes before said: "You're not supposed to talk to these— prisoners." A big heavy-set sergeant stepped closer to me and said, "All they are is a bunch of cowards. They are too yellow to go back to combat. They'll be glad to go back when they finish with this prison." The sergeant ordered them to carry us into the hospital; as they were placing me there in my bed I noticed that one of them had all the fingers of his right hand missing and three fingers of his left. Could such things be allowed in our army? If so, it was being covered up by the brass, and the brass were making suckers of the American people. A ward attendant limping around outside the room came in and said: "I was blown out of a tank; all the muscle of my right leg was blown away. . . . I came through this way on my way [back] to combat. One day the old man (Colonel . . . . . . . . . . . . . . . .) ordered us out on a ten-mile hike. After about two miles I fell flat on my face. They ordered me on, but I couldn't go. So the next day they took me before the old dictator. He ordered me before a quick court martial. I got six months of hard labor. The doctor said I was unfit for hard labor, so they assigned me to this hospital. I'm still a prisoner. The other night a guard caught me stealing a piece of bread from the kitchen, and I got fifty lashes for it." He showed us the welts on his back; he also rolled his pants leg up so we could see his leg. He said that if the prisoners were caught smoking they were whipped or clubbed. In the morning the old colonel himself came along to inspect the hospital. He wasn't

a big guy, but he was stockily built. Behind his glass-
es his eyes were mean. He looked like a man who en-
joys seeing another man suffer. He was surrounded
by a lot of other officers. None of them looked good
to me. After one scowling glance at Red [my buddy]
and me, he left. As we were being carried down the
hall of the ward the big sergeant was clubbing a G. I.
in a corner, while some officers looked on. I only hoped
that some day I would meet up with that big sergeant
and the rest of the people that ran that prison. The
death chair would be too good for them. But as al-
ways, Colonel ............ and the rest of the respon-
sible officers will be protected by the big brass. Mark
my word, Colonel ............ and his bullies will
get off light. That is Lichfield justice.

It is not questioned that by "Colonel ...........",
the "old dictator", and "the old colonel", was meant
Colonel Kilian, the present plaintiff, who was the
commanding officer of the Lichfield camp. At the end
of the article as published there was appended a foot-
note which Dr. Wolfe himself had added and which
stated: "On August 29, 1946, the Associated Press re-
ported that Colonel James A. Kilian was convicted 'of
permitting cruel and unusual punishment of American
soldiers.' He was reprimanded by the military court
and fined $500.—Editor." This insertion was obviously
intended to give the impression that what was said or
implied in the article in regard to Colonel Kilian was
corroborated by his conviction, and further that, as
the author of the article had predicted, he "got off
light".

The fact in regard to plaintiff's trial before a
military court in 1946 is this: He was charged with *au-
thorizing, aiding and abetting* the imposition of cruel,
unusual and unauthorized punishment upon prisoners
in confinement at the depot of which he was the Com-

manding Officer. The punishments referred to were itemized in the charge. A second specification was that he *knowingly permitted* the imposition of such punishments. As to the first specification—authorizing, aiding and abetting—he was acquitted; as to the second specification—knowingly permitting—he was acquitted of *knowingly* permitting and found guilty merely of *permitting;* in other words, he was convicted of neg- lect, but not of actual wrongdoing or of acquiescing in what occurred. Moreover, many of the alleged punishments specified in the charge as having been " permitted" were deleted by the court because they were not supported by the evidence.

It will be noted that O'Connell's article purported to describe in factual style a series of specific happenings which he professed to have seen or experienced at Lichfield, thereby giving them the verisimilitude naturally to be expected from the author's statement that he himself witnessed such occurrences, as distinguished from assertions made on the basis of hearsay only. It will further be noted that O'Connell alleges that he saw Colonel Kilian face to face, and describes him as having "mean eyes" and looking like a sadist. There is also the possible implication in the article, as a jury might find, that the plaintiff's reprehensible conduct consisted, not merely of neglect properly to supervise the administration of the camp, but, if not of actual participation in the cruelty practiced on the prisoners, at least of knowledge that it was being inflicted and conscious indifference to its perpetration; otherwise the author would scarcely have said of "the people who ran that prison" (who, as the context shows, were meant by him to include plaintiff) that "the death chair would be too good for them".

As an affirmative defense to the action defendant pleaded justification on the ground that the publication

was "*a true and accurate account of events which were observed by the author of the article in question.*"[1] How is that defense supported by the testimony presented at the trial? As far as O'Connell being an eyewitness of any of the alleged happenings at the camp is concerned, he admitted on the witness stand that he never was at Lichfield; therefore, his article, in that respect, was wholly false. Defendant produced as witnesses three soldiers who *were* at Lichfield, who testified to punishments inflicted on them or observed by them as imposed on others, but none of the incidents they described tended to prove that a single one of the events narrated in the O'Connell article actually occurred; therefore such testimony was not properly admissible to prove the truth of the publication. While, in order to support a defense of truth, it is necessary merely to prove that it was *substantially* true,[2] and while, therefore, if the testimony of those witnesses had shown a variance merely in the details of the events described in the article it would nevertheless have been admissible as giving support to the plea of truth, it furnished no such support by proving that other and wholly different incidents occurred although these also may have been equally blameworthy. If, for instance, one were to assert that A had embezzled $50 from the X Bank he would not support the truth of such allegation by testimony that A embezzled $100 from the Y Bank,—especially if he were also falsely to state that he actually saw A committing this other embezzlement. "Specific charges cannot be justified by showing the plaintiff's general bad character; and if the accusa-

---

[1] Defendant also pleaded as an affirmative defense that the publication was justified on the ground that it was privileged and based upon reasonable or probable cause.

[2] Act of April 11, 1901, P. L. 74, sec. 2.

tion is one of particular misconduct, such as stealing a watch from A, it is not enough to show a different offense, even though it be a more serious one, such as stealing a clock from A, or six watches from B": (Prosser on Torts, p. 855, §95). "In Skinner v. Powers, 1 Wend. 451 . . . it is said by Chief Justice SAVAGE, that a charge of misconduct *of any specific kind* is not justified by proving plaintiff guilty of misconduct of a similar character. The misconduct relied upon in justification must be proved as broad as the charge; and the proof of the truth of one out of many charges does not constitute a justification": *Burford v. Wible,* 32 Pa. 95, 96, 97. To the same effect see Restatement, Torts, §582, comment e. None of defendant's testimony showed any instances at the camp, as alleged in O'Connell's article, of lashing, of cursing prisoners, of having a soldier whose fingers were missing act as a stretcher bearer, of ordering a badly wounded veteran on a ten-mile hike. It is to be added that defendant's witnesses who testified to what they observed or experienced at Lichfield all admitted that they never saw plaintiff present at any time when any of the alleged occurrences happened; the author of the article himself admitted that when he wrote his story he had never seen plaintiff and did not even know his name. It is obvious that there was not a shred of testimony presented at the trial to prove either that the author of the article saw any of the events he narrated, or that those events or even substantially similar ones occurred, or that plaintiff was aware of any such happenings, or that he sanctioned them, or that he was a "dictator", or that in his very appearance he looked like a man who would enjoy seeing another man suffer. The court, therefore, was in error in submitting to the jury, as it did, the question whether the publication was substantially true.

Counsel for plaintiff submitted points for charge requesting the court to declare that there was no evidence to sustain defendant's plea of justification on the ground that the publication was a true and accurate account of the observations of the author; that there was a material difference between statements as to what an author himself observed and what he was told by someone else; that there was no evidence to support the truth of the specific incidents narrated in the published article. Those requests, for the reasons hereinbefore discussed, should have been granted.

Judgment reversed and new trial awarded.