**MEDICO, Philip T., Appellant,**

v.

**TIME, INC.**

**No. 80–2077.**

United States Court of Appeals, Third Circuit.

Argued Dec. 1, 1980.

Decided March 2, 1981.

Rehearing and Rehearing In Banc Denied March 27, 1981.

Before ADAMS, GARTH and SLOVITER, Circuit Judges.

F. Emmett Fitzpatrick, Jr., Philadelphia, Pa., Charles J. Bufalino, Jr. (Argued), West Pittston, Pa., for appellant.

Peter Hearn (Argued), M. Duncan Grant, Richard W. Foltz, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellee, Robert P. Marshall, Jr., Time Inc., New York City, of counsel.

### OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal from a summary judgment in favor of the defendant presents an important question concerning the law of defamation. We must review the district court's determination that a news magazine enjoys a privilege, under the common law of Pennsylvania, to publish a summary of FBI documents identifying the plaintiff as a member of an organized crime "family." We affirm.

## I.

In its March 6, 1978 issue, Time magazine published an article describing suspected criminal activities of then-Congressman Daniel J. Flood. The article stated that Stephen Elko, a former Flood aide, had characterized the Congressman as a "muscler"—an official who used his considerable influence to direct federal contracts to individuals and companies that responded with cash. The article further stated that at least eight separate United States Attorneys' offices had undertaken investigations of Flood's activities.

As an example of suspected misconduct, the Time article listed the following:

Among the matters under scrutiny: Ties between Flood and Pennsylvania Rackets Boss Russell Bufalino. The suspected link: the Wilkes-Barre firm of Medico Industries, controlled by President Philip Medico and his brothers. The FBI discovered more than a decade ago that Flood steered Government business to the Medicos and traveled often on their company jet. Investigators say Bufalino frequently visited the Medico offices; agents tape-recorded Bufalino's description of Philip as a *capo* (chief) in his Mafia family. Elko's testimony has sparked new investigative interest in the Flood-Medico-Bufalino triangle.

Circulation of the March 6, 1978 issue of Time exceeded four million copies.

Following publication of the article, Medico instituted a defamation action against Time, Inc., in federal district court on the basis of diversity jurisdiction.[1] Medico alleged that the article's import was that he held a high position in an organized criminal society.

Time initially moved for summary judgment in June 1979. It asserted that the substance of the article was not that Medico actually participated in criminal activities, but only that FBI agents had recorded Russell Bufalino's description of Medico as a Mafia *capo*. Time argued that this latter

statement was true. In support of its motion, Time submitted the affidavit of John Danahy, a former FBI official, and two documents—an FBI report on "La Cosa Nostra, Philadelphia Division," and a personal profile report on Philip Medico— which Danahy identified as official FBI documents. Both documents state that an "informant" alternately code-named "PH T–3" and "PH 591–C*" has identified Medico as a close associate of Russell Bufalino and a "capo" or "capodecina" in La Cosa Nostra. The affidavit states that La Cosa Nostra is the FBI's term for the Mafia, and that the "informant" was not a person, but an electronic listening device, by means of which a recording had been made.

The district court agreed with Time that the substance of the allegedly defamatory article was that the FBI had recorded Bufalino's identification of Medico as an underworld leader. It concluded, however, that the supporting documents which Time submitted did not resolve all genuine issues concerning the truth of its report. Although the FBI documents corroborated the Time article, the court ruled that the affidavit Time had advanced to authenticate the documents was not based on the personal knowledge of the affiant, as required by Rule 56(e). The court therefore denied Time's motion for summary judgment.

In January 1980, Time again moved for summary judgment based on the substantial truth of its publication. Time resubmitted the two FBI documents it had proffered to support its initial motion, supplemented with affidavits of two FBI agents. One affiant, David Breen, had supervised an investigation of organized crime that the FBI's Philadelphia Office had conducted. He stated that the Philadelphia Office had prepared the report on La Cosa Nostra at his direction, and that Medico's personal profile card had been prepared and maintained by the FBI. Breen further stated that, based on his personal experience with the FBI, he knew from the code names

---

1. 28 U.S.C. § 1332(a) (1976). At the time he filed the complaint, Medico was a citizen of Pennsylvania. Time, Inc., is incorporated under the laws of Illinois with its principal place of business in New York.

assigned the "informant" that the information in the documents was derived from a tape-recording made by means of an electronic listening device and transcribed by highly trained individuals capable of identifying the voices of the persons recorded. The other affiant, Patrick Collins, also had served in a supervisory position with the FBI. He confirmed Breen's interpretation of the documents, primarily on the basis of his "general experience with similar such reports."

On this occasion the district court granted Time's motion for summary judgment, but not on the basis of the truth defense. The court expressed doubt about its earlier conclusion that, in order to prevail on a truth theory, Time need only establish that FBI agents recorded Bufalino's description of Medico, rather than that Medico was in fact a Mafia chieftain. The court acknowledged that Pennsylvania law might require proof of the underlying assertion, but decided it did not have to resolve the issue; the court concluded that, whether the statement sued upon be given a broad or narrow scope, the evidentiary affidavits that Time submitted failed to establish the truth defense. Although the court found that the affidavits established the authenticity of the FBI report and personal file card as FBI materials, it also determined that neither affiant had personal knowledge of the "factual basis" for the documents. Neither Breen nor Collins had installed the listening devices allegedly used in recording Bufalino's conversations, had transcribed the recorded conversations, or had personal knowledge of the identity of all the participants in the relevant conversations.

After declining to hold for Time on the truth theory, the district court considered whether the Time article fell within the common law privilege accorded the press to report on official proceedings. The judge seemed troubled because Pennsylvania courts apparently had so far extended the privilege only to reports of proceedings open to the public, whereas Time had summarized reports which the FBI had kept secret and whose release to Time evidently had been unauthorized. But after an exhaustive analysis of Pennsylvania precedents, the court concluded that Pennsylvania courts, if presented with the question, would find summaries of non-public government reports within the privilege. The district judge then ascertained that the Time article represented a fair and accurate account of the FBI documents. Accordingly he held that the publication was privileged, and awarded summary judgment in favor of Time.

On appeal, Medico argues that the district court incorrectly determined that Time's publication was privileged under Pennsylvania law. Time counters that the district judge accurately construed the applicable state law on privilege, and contends further that the defense of truth applies and affords an alternate basis for affirming the district court. Our analysis of the district court's result will entail examination of the state law precedents regarding the fair report privilege, of the policies underlying them, and of Constitutional constraints on defamation law.[2]

2. A threshold inquiry is which state's substantive law applies to this diversity action. The parties implicitly agree that Pennsylvania law governs, and the district court applied Pennsylvania law. Inasmuch as Pennsylvania has an interest in the outcome of this litigation—the target of the alleged defamation is a Pennsylvania resident and the issue of Time magazine containing the allegedly libelous article was circulated throughout the state—this Court has no cause sua sponte to challenge the choice of Pennsylvania law. *See Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 269–70 (3d Cir. 1980); *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 501–02 (3d Cir.), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978).

Under Pennsylvania law, a defamation claim consists of two basic elements. First, the communication must be defamatory in nature and understood as such by the recipient. *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 441–42, 273 A.2d 899, 904 (1971); 42 Pa.Cons.Stat.Ann. § 8343(a)(1) to (4) (Supp.1979). Before this court, Time does not dispute the defamatory nature of its statements concerning Medico. Second, the communication must be uttered maliciously—that is, intentionally or negligently and "without just cause or excuse." *Corabi v. Curtis Publishing Co.*, 441 Pa. at 451, 273

## II.

The fair report privilege on which the district court relied developed as an exception to the common law rule that the republisher of a defamation was subject to liability similar to that risked by the original defamer.[3] Pennsylvania had adopted the republication rule by the turn of the century,[4] and no case brought to our attention suggests that Pennsylvania has abandoned it.[5] With this rule, the law indulged the fiction that the republisher of a defamatory statement "adopted" the statement as his own.[6] The common law regime created special problems for the press. When a newspaper published a newsworthy account of one person's defamation of another, it was, by virtue of the republication rule, charged with publication of the underlying defamation. Thus, although the common law exonerated one who published a defamation as long as the statement was true,[7] a newspaper in these circumstances traditionally could avail itself of the truth defense only if the truth of the underlying defamation were established.[8]

To ameliorate the chilling effect on the reporting of newsworthy events occasioned by the combined effect of the republication rule and the truth defense, the law has long recognized a privilege for the press[9] to publish accounts of official proceedings or reports even when these contain defamatory statements. So long as the account presents a fair and accurate summary of the proceedings,[10] the law abandons the assumption that the reporter adopts the de-

A.2d at 909; 42 Pa.Cons.Stat.Ann. § 8344 (Supp.1979). This malice component is "implied or presumed to exist from the unprivileged publication of defamatory words actionable per se." *Corabi v. Curtis Publishing Co.,* 441 Pa. at 451, 273 A.2d at 909 (emphasis deleted). On this appeal, then, the sole issue is whether Time can negate the presumption of malice by establishing that its publication was privileged.

3. *See* W. Prosser, Handbook of the Law of Torts 798 & n.13 (4th ed. 1971); Note, *Privilege to Republish Defamation,* 64 Colum.L.Rev. 1102, 1102 (1964).

4. *See Oles v. Pittsburgh Times,* 2 Pa.Super. 130, 142 (1896) ("One who ... repeats a defamatory accusation is deemed to have published it, and is liable to action although he gives the name of the author."); *Stepp v. Croft,* 18 Pa.Super. 101 (1901).

5. *Cf. Hoover v. Peerless Publications, Inc.,* 461 F.Supp. 1206, 1208 (E.D.Pa.1978) (construing Pennsylvania law) (citing "the black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher").

6. *See* R. Sack, Libel, Slander, and Related Problems § 11.6.1, at 86–87 (1980); Robertson, *Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc.,* 54 Tex.L.Rev. 199, 262–63 (1976).

7. *See* Restatement (Second) of Torts § 581A (1977).

8. The following example is given in *Oles v. Pittsburgh Times,* 2 Pa.Super. 130, 142 (1896): if J.S. publishes that he heard J.A. say that J.G. was a traitor or a thief, then "J.S. must prove that J.G. was a traitor or a thief in order to make a complete defense."

Although the common law placed the burden of proving truth on the defendant, this allocation may run afoul of recently announced constitutional principles. *See* note 38 *infra.* Because we dispose of the present case on the basis of the fair report privilege, we have no occasion to resolve this constitutional issue, or to consider whether Pennsylvania courts would continue to apply the republication rule to a newspaper account of defamatory remarks, *see* Part VII & note 42 *infra.*

9. There is some dispute whether the privilege is available to non-press defendants. The *Restatement* suggests that "any person who makes an oral, written or printed report" on an official proceeding should have access to the defense. Restatement (Second) of Torts § 611, Comment c (1977). While some states adhere to this approach, *see* e. g., N.Y.Civil Rights Law § 74 (McKinney 1976); Ohio Rev.Code Ann. §§ 2317.04–05 (Page 1953); Okla.Stat. tit. 12, § 1443 (1971), other states grant the privilege only to specified press defendants, *see, e. g.,* Mich.Comp.Laws Ann. § 600.2911(3) (West 1968) ("reporter, editor, publisher or proprietor of a newspaper"); N.J.Stat.Ann. § 2A:43–1 (West Supp.1976) ("publication in any newspaper"). Although Pennsylvania, as far as we can tell, has not delineated the availability of the privilege, in light of the identity of defendant Time, Inc., we need not decide at this time whether Pennsylvania would allow non-media defendants to claim the fair report privilege.

10. *See* Restatement (Second) of Torts § 611 (1977); W. Prosser, *supra* note 3, at 832.

famatory remarks as his own.[11] The privilege thus permits a newspaper or "other press defendant to relieve itself of liability without establishing the truth of the substance of the statement reported. The fair report privilege has a somewhat more limited scope than the truth defense, however. So long as the speaker establishes the truth of his statement, he is shielded from liability, regardless of his motives; the fair report privilege, on the other hand, can be defeated in most jurisdictions by a showing that the publisher acted for the sole purpose of harming the person defamed.[12]

Unlike many states,[13] Pennsylvania has never codified the fair report privilege. In addition, while Pennsylvania follows the *Restatement (Second) of Torts* on most matters,[14] the Pennsylvania Supreme Court evidently has not yet had occasion to comment on the *Restatement's* version of the fair report privilege. Earlier, however, the state courts had endorsed the privilege as set forth in the original *Restatement,*[15] and this edition was similar in most respects to the more recent one. We believe it appropriate to accept as the law of Pennsylvania the version of the fair report privilege embodied in the current *Restatement.*[16]

Section 611 of *Restatement (Second)* provides:

Report of Official Proceeding or Public Meeting

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

With respect to the present controversy, the basic inquiry is whether Time's summary of FBI documents concerning Philip Medico is

---

11. *See* R. Sack, *supra* note 6, § VI.3.7, at 316 & n.213. Analytically, the fair report privilege is similar to the truth defense. Both make verity the issue, although requiring that a report be fair and accurate may allow the press a somewhat greater margin of error than requiring that its report be true. In those cases where a plaintiff claims that republication of an official report defamed him *not* by conveying the underlying defamation, but by leading the reading public to believe that a government agency had leveled defamatory charges against him, the two defenses are effectively "merged." The common law defense of truth would turn on whether the government actors had in fact so charged the plaintiff, and the fair report privilege would focus on the same inquiry. *See* Sowle, *Defamation and the First Amendment: The Case for A Constitutional Privilege of Fair Report,* 54 N.Y.U.L.Rev. 469, 506–07 (1979).

12. *See* 1 F. Harper & F. James, The Law .of Torts 450–56 (1956). For this reason, truth generally is referred to as an "absolute," and fair report as a "conditional," privilege. *See generally* Sack, *supra* note 6, § VI.1.

13. For examples of statutory versions of the privilege, see Cal.Civ.Code § 47 (West 1954); Ga.Code Ann. § 105–704 (1978); N.J.Stat.Ann. § 2A:43–1 (West Supp.1978); N.Y.Civil Rights Laws § 74 (McKinney 1976); Ohio Rev.Code Ann. § 2317.04 (Page 1953); Wis.Stat. § 895.05 (1975). Application of the privilege varies from state to state. *See* Comment, *Constitutional Privilege to Republish Defamation,* 77 Colum.L.Rev. 1266, 1275 n.72 (1977).

14. *See Gilbert v. Korvette, Inc.,* 457 Pa. 602, 611 n.25, 327 A.2d 94, 100 n.25 (1974) ("In recent years, this Court .has not hesitated to adopt sections of the Restatement (Second) of Torts (1965) when our common-law precedents varied from the Restatement or when the Pennsylvania common law provided no answer.").

15. *See Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 324, 275 A.2d 53, 56 (1971); *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 177, 191 A.2d 662, 667 (1963); *Sciandra v. Lynett,* 409 Pa. 595, 600, 187 A.2d 586, 589 (1962). Section 611 of the original Restatement of Torts provided:

REPORTS OF JUDICIAL, LEGISLATIVE, AND EXECUTIVE PROCEEDINGS.
The publication of a report of judicial proceedings, or proceedings of a legislative or administrative body or an executive officer of the United States, a State or Territory thereof, or a municipal corporation or of a body empowered by law to perform a public duty is privileged, although it contains matter which is false and defamatory, if it is
(a) accurate and complete or a fair. abridgment of such proceedings, and
(b) not made solely for the purpose of causing harm to the person defamed.

16. *Accord, Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406, 415 (E.D.Pa.1978); *see Hanish v. Westinghouse Broadcasting Co.,* 487 F.Supp. 397 (E.D.Pa.1980) (assuming without elaboration that § 611 of Restatement (Second) represents the law of Pennsylvania).

"a report of an official action or proceeding.'[17]

The district court examined and rejected the possibility that the FBI reports in question are not "official" because they are not generally available to the public. Medico does not challenge this reasoning on appeal, and we perceive no need to rehearse arguments that the district court has already canvassed. Medico contends before this Court that the FBI documents should not be deemed "official" because they express only tentative and preliminary conclusions that the FBI has never adopted as accurate. He points out that the title page to the FBI report on La Cosa Nostra bears the following legend: "This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency."

Neither the text of Section 611 nor the accompanying comments dispose of the issue Medico raises. Section 611 itself speaks only of "official" action or proceedings, without elaborating on when a statement is made in an official capacity. Comment d provides some support for locating the FBI documents concerning Medico within the scope of the privilege. That comment states: "The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege." In the present case, the FBI included its information on Medico in a report on the Philadelphia activities of the Mafia, and forwarded it for inclusion in a report on nationwide organized crime.

But another comment casts doubt on the applicability of the fair report privilege to the FBI materials. Comment h indicates that, while a report of an arrest or of the charge of crime falls within the privilege, "statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of [a] judicial proceeding or of the arrest itself and are not privileged." Because the FBI's information concerning Medico never led to an arrest or prosecution, the FBI materials may be thought to stem from such an early stage of official proceedings that the Section 611 privilege does not attach.

Pennsylvania cases predating the publication of *Restatement (Second)* also fail to resolve definitively whether summaries of criminal investigatory files fall within the privilege. The two cases most nearly on point, however, strongly support Time's defense. In *Sciandra v. Lynett*, 409 Pa. 595, 187 A.2d 586 (1963), the defendant newspaper had published three articles based on the "Reuter Report," a study, commissioned by then-Governor of New York, Averell Harriman, of the activities and associations of individuals who had attended a meeting of alleged organized crime figures.[18] The Pennsylvania Supreme Court held the newspaper's publication protected, announcing the fair report privilege in broad terms: "Upon the theory that it is in the public interest that information be made available as to what takes place in public affairs, a newspaper has the privilege to report the acts of the executive or administrative officials of government." *Id.* at 600, 187 A.2d at 588. As in the present case, there is no

17. Although the Time article did not explicitly credit the FBI Report on La Cosa Nostra or the FBI personal file card on Medico as the Magazine's sources of information, the statements about Medico, taken in context, may reasonably be understood to inform the reader that the story was based on FBI materials. The article should accordingly be regarded as a summary of a purportedly "official" government report. *See Mathis v. Philadelphia Newspapers, Inc.*, 455 F.Supp. 406, 416 (E.D.Pa. 1978) (articles summarizing information supplied by Philadelphia Police Department were accounts of governmental reports and hence within Section 611, even though the articles did not expressly identify the Department as the source of the information); *cf.* R. Sack, *supra* note 6, § VI.3.7.5, at 325 (if the publication does not inform the reader of the identity or nature of the government proceeding, it probably is not a fair and accurate report).

18. Interestingly, one of the alleged crime figures examined by the Reuter Report is Russell Bufalino.

indication that the Reuter Report had led to the arrest or criminal prosecution of any suspected wrongdoer. The Reuter Report, however, bore stronger indicia of representing an "official" act than the FBI materials here: it was filed with the Governor and then released to the public, it evidently did not bear a legend indicating that it reached only tentative conclusions, and it resulted from an inquiry into the history and habits of organized crime figures that occupied New York State officials for several months. While *Sciandra* affords some basis for predicting that Pennsylvania would extend the fair report privilege to the publication challenged in this case, we doubt whether, standing alone, *Sciandra* disposes of this issue.[19]

A decision by a federal district court construing Pennsylvania law also supports application of the privilege to Time's publication. In *Hanish v. Westinghouse Broadcasting Co.*, 487 F.Supp. 397 (E.D.Pa.1980), the court held that the privilege applied to a news report summarizing a civil complaint that contained defamatory accusations and that had formed the basis for a temporary restraining order.[20] The court approvingly quoted Justice Holmes' statement in *Cowley v. Pulsifer*, 137 Mass. 392 (1884), that "[i]f pleadings and other documents can be published to the world by anyone who gets access to them, no more effectual way of doing malicious mischief with impunity could be devised than filing papers containing false and scurrilous charges, and getting those printed as news"; the district court concluded nonetheless that, at least when some judicial action has been taken on a complaint, the fair report privilege applies.[21]

Assuming the court in *Hanish* correctly predicted Pennsylvania law, we think that decision supports application of the Section 611 privilege to the present case. FBI files seem at least as "official" as the pleadings in civil cases. Although civil complaints are instituted, for the most part, by private parties, the FBI documents concerning Medico were compiled by government agents acting in their official capacities. Moreover, the danger that a civil litigant will willfully insert defamatory assertions in his complaint generally would appear at least as great as the risk that a criminal investigatory agency will knowingly include false or malicious statements in its files. If Pennsylvania courts would grant the privilege to newspaper accounts of civil complaints on which a court has acted ex parte, we think it likely that they would grant the privilege to republication of defamatory items from the FBI materials on Medico.

### III.

Three policies underlie the fair report privilege, and an examination of them provides further guidance for our decision today. Initially, an agency theory was offered to rationalize a privilege of fair re-

---

**19.** Other Pennsylvania cases applying the fair report privilege cast little light on the question here, inasmuch as they involved reports of clearly official proceedings. *See Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53 (1971) (account of proceedings in open court at criminal trial); *Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662 (1963) (same).

**20.** Although the Court found the publication within the ambit of the privilege, it denied defendant's motion for summary judgment because it determined that plaintiff had raised a genuine issue of material fact concerning whether the publication fairly and accurately summarized the contents of the complaint.

**21.** Considerable controversy surrounds republication of defamations contained in pleadings on which no official action has been taken. Al-

though Comment e to Section 611 of the Restatement excludes such pleadings from the scope of the privilege. Professor Eldredge writes that "the weight of authority is contrary to the [*Restatement*] rule, and is that the report of pleadings filed in court which have not yet come before a judicial officer and upon which no judicial action has been taken comes within the privilege." L. Eldredge, The Law of Defamation § 79(b)(1), at 430 (1978). *Compare Campbell v. New York Evening Post*, 245 N.Y. 320, 157 N.E. 153 (1927) (reports of preliminary proceedings are privileged), and *American Dist. Tel. Co. v. Brinks, Inc.*, 380 F.2d 131, 133 (7th Cir. 1967) (same), *with Cowley v. Pulsifer*, 137 Mass. 392 (1884) (report of preliminary proceedings not privileged).

port: one who reports what happens in a public, official proceeding acts as an agent for persons who had a right to attend, and informs them of what they might have seen for themselves.[22] The agency rationale, however, cannot explain application of the privilege to proceedings or reports not open to public inspection.[23]

A theory of public supervision also informs the fair report privilege. Justice Holmes, applying the privilege to accounts of courtroom proceedings, gave the classic formulation of this principle:

> [The privilege is justified by] the security which publicity gives for the proper administration of justice.... It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.

*Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884). The supervisory rationale has been invoked in the context of executive action as well.[24]

We believe the public supervision rationale applies to the present case. As public inspection of courtroom proceedings may further the just administration of the laws, public scrutiny of the proceedings and records of criminal investigatory agencies may often have the equally salutary effect of fostering among those who enforce the laws "the sense of public responsibility." For example, exposing the content of agency records may, in some cases, help ensure impartial enforcement of the laws.

It is not necessary for us to decide, however, whether the supervisory rationale is relevant to every republication of documents found in FBI files. For any general supervisory concern with respect to the FBI is heightened in the present case by the public's interest in examining the conduct of individuals it elects to positions of civic trust. Elected officials derive their authority from, and are answerable to, the public. If the citizenry is effectively and responsibly to discharge its obligation to monitor the conduct of its government, there can be no penalty for exposing to general view the possible wrongdoing of government officials. Because the alleged defamation of Medico occurred in an article analyzing the conduct of former Congressman Flood, we believe it implicates this aspect of the supervisory rationale. Moreover, even though Time's publication arguably may have tarnished the reputation of Medico, a private individual,[25] as well as that of Representa-

**22.** Thus in *Curry v. Walter*, 126 Eng.Rep. 1046 (C.P.1796), perhaps the earliest reported case recognizing the privilege, *see* Sowle, *supra* note 11, at 478, Chief Justice Eyre instructed the jury that it is not unlawful to publish "a true account of what took place in a court of justice which is open to all the world." The theory seems to be that because a member of the public could have witnessed the defamation, he is entitled to be informed of it. For an argument that the agency rationale confuses elements that justify republication with those that merely indicate when the privilege may exist, see Note, *supra* note 3, at 1116.

**23.** Courts still occasionally invoke the agency rationale, *see Coleman v. Newark Morning Ledger Co.*, 29 N.J. 357, 387, 149 A.2d 193, 209 (1959) (Weintraub, J., dissenting); *Borg v. Boas*, 231 F.2d 788, 794 (9th Cir. 1956) (construing Idaho law). *See also* Restatement (Second) of Torts § 611, Comment d (1977) ("It is not clear whether the privilege extends to a report of an official proceeding that is not public or available to the public under the law.")

**24.** *See* Note, *supra* note 3, at 1108–09.

**25.** We need not decide whether Medico is a "public figure" for constitutional purposes. Beginning with *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), the Supreme Court has required that "public officials" may not recover in actions for defamation unless they prove that the defendant published false material, knowing of its falsity or with reckless disregard of the truth. The Supreme Court later extended this same protection to defendants in defamation suits brought by "public figures," *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), a class the Supreme Court delineated more specifically on *Gertz v. Robert Welch Publishing Co.*, 418 U.S. 323, 342–45, 351–52, 94 S.Ct. 2997, 3008–09, 3012–13, 41 L.Ed.2d 789 (1974). Where the

tive Flood, the public has a lively interest in considering the relationships formed by elected officials.[26]

A third rationale for the fair report privilege rests, somewhat tautologically, on the public's interest in learning of important matters.[27] While "mere curiosity in the private affairs of others is of insufficient importance to warrant granting the privilege,"[28] the present case does not involve such idle probing. The Time article discussed two topics of legitimate public interest. First, for the same reasons that support the supervisory rationale, examination of the affairs of elected officials is obviously a matter of legitimate public concern. In addition, as various federal courts have already recognized, there is significant public importance to reports on investigations of organized criminal activities,[29] whether or not these implicate government officials.

Because the Time article focused on organized crime, we think the informational rationale is especially relevant. The district court in the case at hand commented on the difficulty of gathering information pertaining to organized criminal activity: "Due to the size, sophistication and secrecy of most organized criminal endeavors, only the largest and most sophisticated intelligence-gathering entities can monitor them effectively. In practice this task has been taken up primarily by the Justice Department of the federal government and, in particular, by the FBI." Indeed, the documents that Time summarized had been compiled by a government agency. In light of the difficulty in obtaining independent corroboration of FBI information, the press may often have to rely on materials the government acquires if it is to report on organized crime at all. We believe Time's publication of FBI materials mentioning Medico served a legitimate public interest in learning about organized crime.

Care must be taken, of course, to ensure that the supervisory and informational rationales not expand into justifications for reporting any defamatory matter maintained in any government file. Personal interests in privacy are not to be taken lightly, and are not to be overborne by mere

---

plaintiff is a "private figure," however, the First Amendment forbids states to impose liability without fault, but otherwise permits them to define for themselves the appropriate standard of liability. *Id.* at 347, 94 S.Ct. at 3010. Although Time argued, in connection with its initial summary judgment motion, that Medico was a public figure, Time withdrew this argument after the Supreme Court indicated in *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9, 99 S.Ct. 2675, 2680 n.9, 61 L.Ed.2d 411 (1979), that the "actual malice" issue generally should go to the jury.

**26.** *See* Sowle, *supra* note 22, at 485–86.

**27.** *See* Note, *supra* note 3, at 1111–16. The Pennsylvania Supreme Court appeared to embrace this rationale in *Sciandra v. Lynett*, 409 Pa. 595, 600, 187 A.2d 586, 587, 588 (1963): "Upon the theory that it is in the public interest that information be made available as to what takes place in public affairs, a newspaper has the privilege to report the acts of the executive or administrative officials of government." *See also Barto v. Felix*, 250 Pa.Super. 262, 267, 378 A.2d 927, 929–30 (1977).

Some jurisdictions rely on the informational rationale to extend the privilege to accounts of the proceedings of public meetings of private, nongovernmental organizations, as long as the meeting deals with matters of concern to the public. *See Barrows v. Bell*, 73 Mass. (7 Gray) 301, 313 (1856); *Pinn v. Lawson*, 72 F.2d 742 (D.C.Cir.1934) (meeting of parish church board); *Borg v. Boas*, 231 F.2d 788, 794–95 (9th Cir. 1956) (meeting calling on judge to convene grand jury). The British Defamation Act of 1952, 15 & 16 Geo. 6 & 1 Eliz. 2, c. 66, § 7, extended the privilege to reports of "proceedings at any public meeting ... bona fide and lawfully held for a lawful purpose and for the furtherance or discussion of any matter of public concern."

**28.** Note, *supra* note 3, at 1111.

**29.** *See Miller v. News Syndicate Co.*, 445 F.2d 356 (2d Cir. 1971); *Time, Inc. v. Ragano*, 427 F.2d 219 (5th Cir. 1970); *Wasserman v. Time, Inc.*, 424 F.2d 920 (D.C.Cir.), *cert. denied*, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970). During the short-lived regime of *Rosenbloom v. Metromedia*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), which applied the *New York Times* standard to defamation actions arising out of reports on matters of public or general interest, courts frequently applied the "actual malice" requirement to actions based on accounts of organized criminal activities. *See Taskett v. King Broadcasting*, 86 Wash.2d 439, 546 P.2d 81, 100 (1976) (Horowitz, J., dissenting).

invocation of a public need to know.[30] But we believe that the public interest is involved when, as here, information compiled by an enforcement agency may help shed light on a Congressman's alleged criminal or unethical behavior.

## IV.

Constitutional considerations also help resolve the present dispute. Although the Supreme Court has never explicitly recognized a constitutional privilege of fair report, several of its recent decisions point toward that result. While we need not decide today whether the First Amendment requires a privilege for the press to report on official acts and proceedings regardless of whether they contain defamatory information, we find that analysis of the constitutional issues reinforces our prediction that Pennsylvania would, as a matter of common law, apply the fair report privilege to Time's publication about Medico.

Two cases from outside the field of defamation reflect the Supreme Court's recognition of the First Amendment value of reports of official proceedings. In *Cox Broadcasting v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Court ruled that the First Amendment precludes a cause of action for invasion of privacy brought about by publication of the name of a deceased rape victim. The Court noted: "Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." *Id.* at 495, 95 S.Ct. at 1046. In addition to these comments, which emphasize the informational rationale for the fair report privilege, the Court stressed the supervisory duties of the public: "The citizenry is the final judge of the proper conduct of public business.... With respect to judicial proceedings in particular, the function of the press serves ... to bring to bear the beneficial effect of public scrutiny upon the administration of justice." *Id.* at 495, 492, 95 S.Ct. at 1046, 1044.

While *Cox Broadcasting* arose from a news report based on judicial records open to public inspection, the Court's commitment to dissemination of information of interest and value to the public seems just as apposite when, as here, the press reports on materials not open for inspection. Moreover, the Court in *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), extended the protective mantle of the First Amendment to a report of a proceeding closed to the public. The Court there held that a state may not impose criminal sanctions on those who publish information regarding proceedings before a state judicial review commission, even when the state constitution and laws declare the proceedings confidential. The Court again stressed the need for public knowledge of the affairs of government: " 'A major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.' ... Neither the Commonwealth's interest in protecting the reputation of its judges, nor its interest in maintaining the institutional integrity of its courts is sufficient to justify the subsequent punishment of speech at issue here. *Id.* at 838, 841, 98 S.Ct. at 1541, 1542 (quoting *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966)).

*Landmark Communications*, like *Cox Broadcasting*, does not strictly control the issue before us—for *Landmark* arose in the context of criminal sanctions,[31] rather than

---

**30.** The excesses of the McCarthy era, for example, prompted some commentators to point out the reputational injury the republication of official defamation can cause, and to advocate restricting the fair report privilege. *See* Pedrick, *Senator McCarthy and the Law of Libel: A Study of Two Campaign Speeches*, 48 Nw.U. L.Rev. 135 (1953); 13 Rutgers L.Rev. 723, 727 (1959). *See also Coleman v. Newark Morning Ledger Co.*, 29 N.J. 357, 149 A.2d 193 (1959)

(serviceman previously unknown to public defamed by Senator McCarthy's summary of secret Congressional hearings; newspaper account held privileged.)

**31.** At least one commentator has remarked that "[t]he fact that the defendant in *Landmark* suffered a criminal sanction, as opposed to a civil liability for defamation, should have no bearing on the relevance to defamation law of

a defamation suit, and plaintiff in *Landmark* was a public official.[32] But in both *Cox Broadcasting* and *Landmark Communications*, the Supreme Court articulated the First Amendment value of reports that inform the public of the affairs of government and assist the citizenry in its supervisory duties. In *Cox Broadcasting* these values applied in the context of a damage action instituted by a private figure, and in *Landmark Communications* they could not be overcome by the confidentiality of the materials reported on.[33] Since we have found that the publication at issue here implicates these informational and supervisory interests, *Cox* and *Landmark* provide a constitutional basis for applying a fair report privilege to a controversy which, like the present one, arises from a private figure's damage action for publication of reports not available to the public.

Closer to the facts in our case is *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), which some commentators have interpreted as elevating the fair report privilege into a constitutional requirement.[34] *Pape* arose from a Time magazine article that quoted excerpts from a Report of the United States Commission on Civil Rights. One section of the Report, dealing with police brutality, listed in detail allegations against Pape and other Chicago police officers contained in a civil complaint; Time quoted the allegations without citing the complaint, arguably making it appear that the allegations were factual findings of the Commission.

The precise issue presented to the Supreme Court was whether there was sufficient evidence for a jury to conclude that Time magazine, in omitting to mention that the charges of brutality were allegations of a complainant rather than findings of the Commission, had published material it knew to be false, or had acted in reckless disregard of the truth.[35] The Court observed that it is often possible to separate the question of the truth of the publication from the question of whether the publisher had an adequate basis for believing his publication true. 401 U.S. at 285, 91 S.Ct. at 637. But not all cases are susceptible to this analysis: "A vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody *said* rather than of what anybody *did*. Indeed, perhaps the largest share of news concerning the doings of government appears in the form of accounts of reports, speeches, press conferences, and the like. The question of the 'truth' of such an indirect newspaper report presents rather complicated problems." *Id.* at 285–86, 91 S.Ct. at 637 (emphasis in original). After analyzing the Time article in light of the Commission Report, the Court concluded that Time had not engaged in a falsification sufficient to warrant a jury finding of actual malice.

---

the Court's reasoning." Sowle *supra* note 22, at 500. As the Supreme Court observed in *New York Times v. Sullivan*, 376 U.S. 254, 277, 84 S.Ct. 710, 724, 11 L.Ed.2d 686 (1964), "the fear of damages awards ... may be markedly more inhibiting than the fear of prosecution under a criminal statute."

**32.** Some language in *Landmark* suggests that the Court may have limited its reasoning to public officials; thus, the Court observed: "Our prior cases have firmly established ... that injury to official reputation is an insufficient reason 'for repressing speech that would otherwise be free.'" 435 U.S. at 841–42, 98 S.Ct. at 1542–43 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 272–73, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

**33.** Cf. *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (classified status of Defense Department study of Viet Nam War does not justify prior restraint of newspaper publication).

**34.** See Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc., and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349, 1362 n.46 (1976); Comment, *The Expanding Constitutional Protection for the News Media from Liability for Defamation; Predictability and the New Synthesis*, 70 Mich.L.Rev. 1547, 1555 (1972); W. Prosser, *supra* note 3, at 832.

**35.** Pape did not challenge the findings of the district court that he was a "public official." See 401 U.S. at 284, 91 S.Ct. at 636.

While the fair report privilege was not at issue in *Pape*,[36] the Court's explicit recognition of the sensitive First Amendment problems that arise when the press publishes accounts of government reports and activities has not been lost on other federal courts. At least one court of appeals, citing *Pape*, has generalized this concern to create a constitutional privilege whenever the press republishes defamatory comments while reporting on newsworthy events. In *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), the Second Circuit stated:

> When a responsible, prominent organization ... makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity.... What is newsworthy about such accusations is that they were made.... The public interest in being fully informed about controversies that often rage around sensitive issues de-

mands that the press be afforded the freedom to report such charges without assuming responsibility for them.

Although this Court, in dicta, has declined to follow *Edwards, see Dickey v. CBS, Inc.*, 583 F.2d 1221, 1225–26 (3d Cir. 1980), other federal courts have, as a matter of federal law, expressed reluctance to hold the press responsible for publication of defamatory statements originally uttered by others.[37] Moreover, the concerns underlying *Pape* and *Edwards* are heightened when the source of newsworthy defamation is a government official or report.[38]

We are careful to point out that we do not decide at this time that the First Amendment immunizes a newspaper's republication of a defamation arising in connection with a matter of public interest, and originally authored by a government source. But we believe that the solicitude that both the Supreme Court and other federal tribunals have expressed for the press in such circumstances might well influence the Pennsylvania Supreme Court's application of its common law privilege of fair report.[39]

---

**36.** The way a plaintiff frames the allegations of defamation determines what factual allegations a truth defense requires. *See* W. Prosser, *supra* note 3, at 798. Pape did not allege that the "gist" or "sting" of the Time article was that he was guilty of brutality, but rather that Time defamed him by falsely asserting that the Commission charged that Pape was guilty of brutality. The case thus did not implicate the fair report privilege, since the object of the privilege—to put in issue the truth of the report that a third party defamed the plaintiff, rather than the truth of the underlying defamation—had been attained by virtue of how Pape framed his case. For a more thorough discussion, see Sowle, *supra* note 22, at 501–08.

**37.** *See Medina v. Time, Inc.*, 439 F.2d 1129 (1st Cir. 1971); *Oliver v. Village Voice, Inc.*, 417 F.Supp. 235, 238 (S.D.N.Y.1976); *Novel v. Garrison*, 338 F.Supp. 977, 982–83 (N.D.Ill.1971).

**38.** The news report at issue in *Dickey* involved a defamation originally uttered by a public official, but one speaking in a personal rather than in an official capacity. *See* 583 F.2d at 1222–23. Plaintiff in *Dickey* admitted that he was a public figure and could prevail on his defamation claim only if he satisfied the *New York Times* standard of "actual malice," *see* note 25 *supra*. The Third Circuit affirmed the district court's holding that plaintiff had failed to satisfy his burden of proof on this issue. *Id.* at

1227–29. The court's discussion of *Edwards v. National Audubon Society, Inc.*, was thus irrelevant to its decision.

**39.** Since the Supreme Court's decision in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 680 (1964), Pennsylvania cases frequently have taken account of constitutional principles while fashioning common law rules of defamation law. The result is that "no rigid line of demarcation may be maintained between state law rules and constitutional norms, for both are intermixed in the Pennsylvania precedents." *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 502 (3d Cir.), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). For an illustration, see *Matus v. Triangle Publications, Inc.*, 445 Pa. 384, 395, 286 A.2d 357, 362–63 (1971), where the Pennsylvania Supreme Court, following the decision on *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), engrafted onto Pennsylvania law the rule that the *New York Times* knowing or reckless falsity standard applies in a civil libel action brought by a private individual for defamatory falsehoods uttered in a news broadcast about the individual's involvement in an event of public or general interest.

The trend of federal case law strengthens our belief that the Pennsylvania Court, if confronted with the question, would find the Time article that Medico challenges within the ambit of the privilege.

## V.

■ Once the libel defendant establishes the existence of a "privileged occasion" for the publication of a defamatory article, the burden returns to the plaintiff to prove that the defendant abused its privilege. *Sciandra v. Lynett*, 409 Pa. 595, 601, 187 A.2d 586, 589 (1963). Pennsylvania recognizes two forms of "abuse": the account of an official report may fail to be fair and accurate,[40] as when the publisher overly embellishes the account, *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53, 56 (1971); *Sciandra v. Lynett*, 409 Pa. at 600, 187 A.2d at 589; or the defamatory material may be published for the sole purpose of causing harm to the person defamed, *id.* Inasmuch as Medico does not allege that Time published its article for the purpose of harming him, the sole issue with respect to abuse of privilege is whether the district court erred in concluding that there was no genuine question whether Time's publication fairly and accurately summarized the FBI materials concerning Medico.

We agree with the district court that nothing in the record suggests that the Time article unfairly or inaccurately reported on the FBI materials. Medico asserts that Time's failure to mention the legend on the FBI report on the Philadelphia

Branch of La Cosa Nostra renders its story unfair. No similar legend, however, appears on the FBI's personal file card on Medico, which is an independent source of the information reported. Moreover, nothing in the Time article expresses a "recommendation" or "conclusion" on the part of the FBI concerning Medico's participation in Mafia activities. The article simply says that FBI "agents tape-recorded Bufalino's description of Philip as a *capo* (chief) in his Mafia family."

Medico also insists that, because the FBI files identify the "informant" only by a code name, it is impossible to ascertain whether Time's summary was accurate. But the uncontradicted affidavits of Breen and Collins establish that the code names refer to electronic listening devices that the FBI planted in the Philadelphia area. Time has accurately portrayed the FBI records as indicating that Medico has been identified as part of the Bufalino crime family.

## VI.

■ Medico further contends that Time can avail itself of the fair report privilege only if it actually based its article on the FBI materials; if the report reflects the contents of the official materials merely by coincidence, the privilege does not attach. Medico maintains there is a genuine issue of fact whether Time employees worked with the FBI materials in preparing the article.

Pennsylvania law squarely contradicts this argument. In *Binder v. Triangle Pub-*

---

**40.** Placement on the plaintiff of the burden of demonstrating that a privileged report was not fair and accurate traditionally distinguished the fair report privilege from the truth defense, in which defendant bore the burden of proving truth, *see Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 449–50, 273 A.2d 898, 908–09 (1971). After *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct 2997, 41 L.Ed.2d 789 (1974), it is doubtful that a state can place the burden of proving truth on the defendant. *Gertz* held that a plaintiff in a defamation action must be required to demonstrate "fault" on the part of defendant, *id.* at 347, 94 S.Ct. at 3010, and rejected Justice White's suggestion, offered in dissent, that a publisher may be required to prove the truth of a defamatory statement concerning a private individual, *id.* at 347 n.10, 94 S.Ct. at 3010 n.10. We have earlier questioned whether Pennsylvania's placement of the burden of proving truth on the defendant survives *Gertz*, *see Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 274 n.49 (3d Cir. 1980), and at least one member of the Pennsylvania Supreme Court has expressed similar reservations, *see Moyer v. Phillips*, 462 Pa. 395, 341 A.2d 441, 447 (1975) (Roberts, J., concurring). *But see* Eaton, *supra* note 33, at 1381–86, 1429 (*Gertz* tolerates common law rule of presuming falsity of defamatory publication, and placing on defendant burden of proving truth).

*lications, Inc.*, 442 Pa. 319, 275 A.2d 53 (1971), a newspaper printed an allegedly libelous article that purported to summarize testimony at a criminal trial. The reporter who wrote the article had not attended the trial, however, but had based his story on information supplied by persons who had attended. The Pennsylvania Supreme Court held the story was nonetheless privileged. It said: "How a reporter gathers his information concerning a judicial proceeding is immaterial provided his story is a fair and substantially accurate portrayal of the events in question." *Id.* at 327, 275 A.2d at 58. In the present case, then, how Time magazine obtained its knowledge of the FBI materials is irrelevant under the law of Pennsylvania.[41] The article is privileged as a fair and accurate summary of the FBI materials.

## VII.

We conclude that Time's publication of an allegedly defamatory article concerning Philip Medico falls within the scope of the Pennsylvania common law privilege of fair report, and that Medico has failed to estab-

lish a genuine issue of fact concerning a possible abuse of the privilege. We therefore find it unnecessary to address Time's alternative argument for affirmance: that the affidavits it submitted establish the substantial truth of its publication. In particular, we need not examine the issue, left unresolved by the district court, whether under Pennsylvania law repetition of another's words relieves the press of the need to prove the truth of the underlying assertion as long as it accurately ascribes all it says to the original utterer.[42]

The judgment of the district court granting Time's motion for summary judgment will be affirmed.

---

**41.** Medico cites *Kilian v. Doubleday & Co.*, 367 Pa. 117, 79 A.2d 657 (1951), as establishing that, in order to be privileged as true or as a fair report, a defamatory statement must be based on the personal observations of the speaker. Medico's reliance is misplaced. In *Kilian*, the author had written his story in the first person; although he based his portrayal of events on the reports of other people, he wrote the story as though he had witnessed the events himself. Thus, his story carried "the verisimilitude naturally to be expected from the author's statement that he himself witnessed such occurrences, as distinguished from assertions made on the basis of hearsay." Under these circumstances, the Pennsylvania Supreme Court indicated that the defendant could prevail on his truth defense only by establishing the events related. By contrast, the authors of the Time article made no claim to have heard the FBI recordings they reported. *Kilian* does not suggest that a defense of truth or privilege requires that the story be based on personal observations of the author, when the account makes no claim to first-hand knowledge.

**42.** The possible interpretations of Time's publication about Medico may be used to illustrate the different approaches to the truth defense. The Time article is subject to at least three constructions:

    A.  Medico is a Mafia *capo.*

    B.  Government agents overheard Bufalino describe Medico as a Mafia *capo.*

    C.  FBI records indicate that government agents overheard Bufalino describe Medico as a Mafio *capo.*

Under the fair report privilege, the accuracy of C relieves Time of liability. If the privilege did not apply, however, we would have to ascertain whether Pennsylvania law would exonerate Time on the basis of the truth defense if Time established the truth of B, or whether Time would have to prove A. In light of our holding that Time's publication comes under the fair report privilege, we need not dispose of this question. In addition, we need not review the district court's determination that Time has failed to demonstrate the truth of either A or B.