**Greene v. Philadelphia Media Network, Inc.**

*Clifford E. Haines, Lauren A. Warner, Andrew J. Kenis, Mark J. Schwemler and Noah S. Cohen*, for plaintiff.

*Raphael Cunniff, Eli M. Segal, Amy B. Ginensky and Kaitlin M. Gurney*, for defendants.

RAU, *J.*, Aug. 1, 2014—

## MEMORANDUM OPINION[1]

Plaintiff Carl Greene sued defendants, Philadelphia Media Network, Inc., and Philadelphia Media Network (Newspapers), LLC, for monetary damages for defamation, false-light invasion of privacy, and commercial disparagement based on seventeen articles and editorials concerning Mr. Greene's tenure as executive director at the Philadelphia Housing Authority, which were published in the Philadelphia Inquirer and Daily News between November 1, 2010 and August 9, 2011. Defendants filed a motion for summary judgment asserting that plaintiff Greene, who is a public figure, did not show by clear and convincing evidence that the articles were materially false or that defendants published them with actual malice, that is "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). Defendants argued that the first amendment protects publishers from liability for defamation for unreasonable interpretations of articles' meanings, claimed unfairness in presentation, opinions, immaterial inaccuracies or truthful articles.[2]

---

1. This brief memorandum opinion is drafted without the benefit of the written transcript. If there is an appeal, this court may amplify this opinion with citations to the evidentiary hearing and further analysis.

2. *See, e.g., Tucker v. Phila. Daily News*, 848 A.2d 113, 133 (Pa. 2004) ("[A]n article is not made defamatory by being unfair...."); *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987) ("[O]pinion without

Movants also argued[3] that plaintiff Greene could not overcome the fair report privilege, which provides that when "it is in the public interest that information be made available as to what takes place in public affairs, a newspaper has the privilege to report the acts of the executive or administrative officials of government." *Sciandra v. Lynett*, 187 A.2d 586, 588 (Pa. 1963). Once defendants filed their summary judgment motion, the law required plaintiff Greene to refute with *actual evidence* any facts essential to the cause of action that defendants asserted were not disputed. Pa.R.C.P. 1035.3(a)(2). At this stage, the plaintiff "may not rest upon the mere allegations or denials of the pleadings" but must respond with more. Pa.R.C.P. 1035.3(a). Plaintiff Greene offered Dr. Timothy Habick as an expert in linguistics to provide his primary evidence that defendants published the articles with actual malice. Defendants challenged Dr. Habick's proffered expertise and report and requested a *Frye* hearing. (Defs.' reply in supp. of mot. summ. j. at 11, n.5.)

This memorandum addresses this court's findings and conclusions on the legal admissibility of Dr. Habick's testimony under Pennsylvania Rule of Evidence 702 and

more does not create a cause of action in libel."); *Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 216 (Pa. 1981) ("[W]e must consider the full context of the article to determine the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.") (internal quotations omitted); *Kilian v. Doubleday & Co.*, 79 A.2d 657, 660 (Pa. 1951) (a statement that is "substantially true" cannot be defamatory); *ToDay's Hous. v. Times Shamrock Commc'ns, Inc.*, 21 A.3d 1209, 1215 (Pa. Super. Ct. 2011) (finding an absence of material falsity and explaining, "The law does not require perfect truth, so long as any inaccuracies do not render the substance and 'gist' of the statements untrue.").

3. Defendants also argued that Greene did not show evidence that any of the statements caused him injury to his reputation, emotional distress or economic loss.

accompanying case law following a *Frye* hearing on July 28, 2014. Plaintiff Carl Greene's proffered expert, Dr. Timothy Habick, submitted a report stating that, upon review and analysis of all of the allegedly defamatory articles written by numerous authors, he concluded that the writing showed that the defendants "willfully, maliciously, without substantiation, and with reckless disregard for the truth, defamed" plaintiff Carl Greene. (PL's answer in opp'n to defs.' mot. summ. j. ex. L, at 3.) Plaintiff's counsel offered Dr. Habick's testimony as a linguist for two reasons: (1) to explain what the articles mean to the average reader, and (2) to show that defendants published the articles with actual malice, that is, "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *Sullivan*, 376 U.S. at 279-80. In short, plaintiff has offered a linguist to testify as an expert to what an average reader thinks, and to what the mental state of the defendants' seven authors and editorial board was when they published allegedly false statements. Defendants challenged Dr. Habick's qualifications, the relevance of his testimony, and the reliability of his methods, claiming that they were not "generally accepted in the relevant field" of linguistics. Pa.R.Evid. 702; *Grady v. Frito-Lav*, 839 A.2d 1038, 1047 (Pa. 2003).

Given the considerable clout that the term "expert" imbues to a jury, Pennsylvania law requires that the judge serve as a gatekeeper before proffered expert testimony is provided at trial. The judge must screen to ensure that the witness has demonstrated qualifications in the field offered, the testimony provides information that an average juror would not already possess, the testimony is relevant and the methods used are reliable. Pennsylvania Rule of Evidence 702 provides:

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field."

Pa.R.Evid. 702. In examining the admissibility of expert witness testimony, the Pennsylvania Supreme Court has recently held:

"[T]his court has recognized the influential nature of expert testimony on complex subjects, and the potential that distortions have to mislead laypersons.... [W]e conclude that a *Frye* hearing is warranted when a trial judge has articulable grounds to believe that an expert witness has not applied accepted scientific methodology in a conventional fashion in reaching his or her conclusions."

*Betz v. Pneumo Abex LLC*, 44 A.3d 27, 53 (Pa. 2012). Plaintiff's counsel conceded that the type of "unique" testimony offered here rendered a *Frye* hearing appropriate. *Trach v. Fellin*, 817 A.2d 1102, 1109 (Pa. Super. Ct. 2003) ("*Frye* only applies when a party seeks to introduce *novel* scientific evidence."). Plaintiff Greene, as the proponent of the evidence, bears the burden of establishing "all of the elements for its admission under Pa.R.E. 702, which

includes showing that the *Frye* rule is satisfied." *Grady v. Frito-Lay*, 839 A.2d 1038, 1045 (Pa. 2003).

In explaining the idea of "methodology," the Pennsylvania Superior Court has explained that replicability, or reproducibility, lies at the heart of the scientific method:

> "[T]he scientific method is a method of research in which a problem is identified, relevant data are gathered, a hypothesis is formulated from these data, and the hypothesis is empirically tested. Within the meaning of the definition of the scientific method, 'empirical' means 'provable or verifiable by experience or experiment.' Key aspects of the scientific method include the ability to test or verify a scientific experiment by a parallel experiment or other standard of comparison (control) and to replicate the experiment to expose or reduce error."

*Trach*, 817 A.2d at 1113 (internal citations omitted). "*Frye* only applies to determine if the relevant scientific community has generally accepted the principles and methodology the scientist employs, not the conclusions the scientist reaches...." *Id.* at 1112.

An expert must be qualified in the field in which they testify.

This court found that Dr. Habick was not qualified in the areas for which his testimony was offered. Dr. Habick was offered as an expert in linguistics and logic to offer an opinion about (1) how average readers would read the articles and (2) how linguistic and logical analysis shows that defendants and their reporters "willfully, maliciously, without substantiation, and with reckless disregard for

the truth, defamed" plaintiff Carl Greene. (Pl.'s answer in opp'n to defs.' mot. summ. j. ex. L, at 3.)

Dr. Habick testified that he has spent the bulk of his career developing test questions for graduate school admissions tests, initially at the Educational Testing Service (ETS) and then at his business, Reasoning, Inc., which he founded after his departure from ETS in 2001. He used his linguistic expertise to develop questions that achieved the "highest level of fairness" for test-takers. Dr. Habick's venture into the field of forensic linguistics is a fascinating tale of serendipity.[4] Dr. Habick testified that he met Dr. Marilyn Lashner's daughter in 2009 and later met Dr. Lashner. When Dr. Lashner died the next year, her children gave Dr. Habick her business, Media Analysis and Communications Research. Prior to being bequeathed this forensics linguistics business, Dr. Habick had never worked in the area of forensics linguistics, nor had he done any linguistic analysis in the area of defamation. Dr. Habick was assisted in this new venture by reviewing Dr. Lashner's prior reports and analyses after her death. Though Dr. Habick's resume lists among his accomplishments that he "[provided forensic linguistic services in support of Dr. Marilyn Lashner's case evaluations, analyses and reports, discovery assistance, and testimony," he admitted in his testimony that he had never actually worked with Dr. Lashner but instead had been only an acquaintance. (*See Frye* Hr'g Defs.' Ex. 7, Aff. of Timothy Habick, *Schnitt v. Cox Radio, Inc., et al.*, Case No. 08-05738 (Fla. Cir. Ct.).)

Dr. Habick testified that he analyzed the logical

---

4. Dr. Habick testified that he met Dr. Lashner when her daughter came by his home in 2009, notified him that Dr. Lashner had previously lived in his home and asked whether Dr. Lashner could visit her former home. Thereafter, he developed a relationship with the family.

structures and identified fallacious arguments in the articles in question. However, he is not a logician. Dr. Habick claims expertise in this area due to having worked alongside and collaborating with logicians during his 27 years of writing exam questions. This assertion has faulty logic: a nurse is not qualified to do surgery just because the nurse has worked alongside a surgeon for many years and may be familiar with much of what occurs in the operating room. Dr. Habick has insufficient expertise under the law to give testimony in the area of logic.

Dr. Habick uses the term defamatory and defamation throughout his report but his testimony showed that he did not know the correct legal definition of defamation[5] for public figures. A public figure is not defamed under the law just because embarrassing facts are publicized and opined about by writers. True statements, even if unflattering, do not constitute defamation. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1985); *Spain v. Vicente*, 461 A.2d 833, 836 (Pa. Super. Ct. 1983). A public-figure plaintiff such as Carl Greene must show by clear and convincing evidence that the allegedly defamatory statements were materially false and made with actual malice. *Gertz v. Robert Welch. Inc.*, 418 U.S. 323, 342 (1974). Dr. Habick is not qualified to render an opinion

---

5. In Pennsylvania, any person bringing a defamation claim bears the burden of proving:
"(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion."
*Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 903 (Pa. 2007) (citing 42 Pa. CONS. STAT. ANN. §8343(a)).

concluding that defendants "defamed" plaintiff when he does not know how defamation is defined under the law.

Dr. Habick also misunderstands the application of the actual malice standard in defamation cases: falsity is a precondition to actual malice. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (defining actual malice as publishing statements "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not"). "Actual malice under the *New York Times* standard should not be confused with common-law malice or the concept of malice as an evil intent or a motive arising from spite or ill will." *See also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991). The actual malice requirement is a subjective, not an objective, standard: showing that a defendant *should have* seriously doubted the accuracy of her or his story is insufficient. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989); *see also Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) (a plaintiff cannot prevail without clear and convincing evidence of a "calculated falsehood"); *Am. Future Sys. Inc., v. Better Bus. Bureau*, 923 A.2d 389, 395 n.6 (Pa. 2007) (proving actual malice is difficult because actual malice "implies at a minimum that the speaker entertained serious doubts about the truth of his publication, ...or acted with a high degree of awareness of...probable falsity"); *Bartlett v. Bradford Publ'g, Inc.*, 885 A.2d 562, 564 (Pa. 2005) (mere departure from journalistic ideals not actual malice).

Dr. Habick analyzed the defendants' articles to assess whether defendants published statements intentionally knowing they were false or with recklessness as to their falsity, *even though he had no information* as to whether the statements were actually false. He testified that he talked to plaintiff's counsel, read the complaint, and relied

upon his "common sense", "common knowledge," and "verifiable truths." He admitted he did no factual research save for some minor internet searches. This process shows again that he misapprehends the legal definition of actual malice for public figures. The statements must be proven as false *before* a publisher can be found to have actual malice in publishing them. *See St. Amant v. Thompson*, 390 U.S. 727, 730 (1968) (defamation plaintiff has "the burden of proving that the *false* statements . . . were made with actual malice as defined in *New York Times Co. v. Sullivan* and later cases" (emphasis added)). Dr. Habick began his analysis with faulty assumptions that statements were false. Dr. Habick dismissed this concern by testifying that if any of the allegedly defamatory statements turned out to be true, his opinion should just be ignored as to those statements and kept intact for the others. Not only is this approach contrary to sound scientific method but it illustrates a fundamental lack of understanding of what "actual malice" means in the context of defamation.

Actual malice in the context of public figure defamation is not the same as malice in common usage. Actual malice does not mean "evil" or "critical." *Masson*, 501 U.S. at 510. There is nothing inappropriate about reporters' publishing unflattering information that is materially true or they even justifiably think is true. The press must be permitted to write about public officials like plaintiff Greene in order to keep the citizenry informed about the conduct of those serving in their government. Public officials in a democracy must be open to being evaluated by the press and the public they serve. Muzzling the press from criticizing public officials would threaten good government and ultimately threaten democracy's survival.

Dr. Habick also has no training or experience in

journalism. He has no background or experience in empirically testing or scientifically determining the intent of journalists or any other group of writers to determine whether they have written articles with malice as defined by defamation law. Though Dr. Habick was being offered for the purpose of testifying about how an article is read by an average reader, he conceded that he is unable to read as an average reader himself based on his extensive experience in linguistics. He also conceded that he has never tested how average readers interpret journalistic pieces outside the context of high-stakes graduate testing. Though Dr. Habick has been offered as an expert in prior cases, he has never been qualified by a court to give his expert opinion in a defamation case.

Thus, Dr. Habick does not have the requisite qualifications to testify as an expert to what an average reader might think or the subjective intent of defendants and their reporters when they published the articles.

An expert's methodology must be reliable as evidenced by being generally accepted in the field.

Plaintiff failed to meet his burden of showing that Dr. Habick used methodology that was generally accepted in the field of linguistics. Plaintiff's claims of what his linguistic expert could provide were bold: he claimed that a linguistic expert could use a scientific method to determine the subjective intent of publishers and reporters when they wrote and published articles. In short, a linguistic expert could divine by a mere reading and analysis of articles, and nothing more, whether a publisher and its many reporters wrote the articles "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-

80 (1964). Such a promise, if true, would prove exciting indeed: courts could reduce the number of trials, police investigations could be shortened, and crimes could be solved if a linguist could be employed to merely analyze another speaker's language, without reference to any facts, and determine the speaker's mental intent. However, Dr. Habick's analysis was not shown to be accepted science to permit its admission in court. His analysis was not based on factual research, was not replicable, lacked the requisite degree of certainty, and used methods that were not shown as generally accepted within the field of linguistics.

Dr. Habick testified that he reached his opinions "solely on the basis of the examination of the articles" and not on "deposition testimony or other facts contained in documents that were exchanged by the parties after this case was initiated." (Pl.'s answer in opp'n to defs.' mot. summ. j. ex. L, at 4.) Dr. Habick testified as to what he did to reach his opinion. He first met with plaintiff's counsel, who explained the issues. Next he read the complaint but not the answer. Dr. Habick then applied his linguistic analysis to the seventeen articles. His linguistic analysis involved looking at the linguistic structures, including argumentation, logical fallacies, and assumptions. Dr. Habick testified that he used his "common sense," "common knowledge," and "verifiable reality" to reach his conclusions as to the truth of statements made. Dr. Habick admitted he did no fact checking, other than some unspecified internet research, to determine whether statements were true or not. He provided the ultimate disclaimer: if any statements made by defendants were found to be false, his conclusions that they were defamatory and made with malice should be ignored.

Dr. Habick also contributed another proviso that

compromised the admissibility of his testimony: he testified he was making the claim only that there was a "likelihood" that the published statements were defamatory and made with malice, but that he could not speak with certainty. The law generally requires that experts testify to more than a mere "likelihood" of the substance of expert testimony to make it admissible as having any value to a jury. Dr. Habick's opinion lacked the requisite certainty for expert testimony. *See Hoffman v. Brandywine Hosp.*, 661 A.2d 397, 402 (Pa. Super. Ct. 1995) (an expert's opinion lacks a reasonable degree of certainty if it is based merely upon a "likelihood" that something "may" have occurred). *See also Com, v. Spotz*, 756 A.2d 1139, 1160 (Pa. 2000) (experts are not required to use "magic words," but rather the court "must look to the substance of [the expert's] testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation"). In addition, Dr. Habick's conditioning his opinion as finding there was a mere "likelihood" of actual malice itself compromised plaintiff's success in this case. The law requires that plaintiff must show by clear and convincing evidence, not mere likelihood, that defendants knew the statements were false or published with reckless disregard of whether they were false to defeat summary judgment. *Sullivan*, 376 U.S. at 279-80.

Dr. Habick testified that he had no hypothesis for his analysis. He did not retain or provide any of the underlying notes or data he used for his analysis. He conducted no surveys or questionnaires of readers as to their interpretations of the articles to support his opinion as to what "average readers" might conclude upon reading the articles. With respect to his opinion about the intent of the authors, Dr. Habick testified that what the authors *said*

about their intent in writing the article was not relevant to his analysis of their subjective intent in terms of actual malice. No validity or replicability studies were performed or attempted.

When Dr. Habick was pressed to describe how his process of analysis fit within the methodology used in the field of linguistics, he evaded responding with precision. He simply insisted that this is what linguists do: they analyze structures. This vagueness makes it impossible to validate or test his analysis and has been frowned upon by the Supreme Court when assessing the admissibility of scientific methodology:

> "[T]he breadth and character of an expert's extrapolations are relevant to the scientific acceptance of his methodology. The alternative is to permit experts to evade a reasoned *Frye* inquiry merely by making references to accepted methods in the abstract."

*Betz v. Pneumo Abex LLC*, 44 A.3d 27, 58 (Pa. 2012).

Strikingly, Dr. Habick failed to employ the methods used in linguistics within the context of test examination questions, for which he has experience to verify or replicate his results. He conducted no interannotater studies or any other validity studies to verify his conclusions, as is done in the test-taking field. Not only did he fail to articulate a clear replicable methodology he employed that could be replicated by others in his field, he made no attempt to have other linguists verify or evaluate his methods. Plaintiff failed to provide any evidence that Dr. Habick's linguistic analysis of a reporter's articles to determine if they had satisfactory argumentation, logic, or assumptions could even reveal an author's intent or recklessness in writing an

article. Even if he could show that articles have fallacies, he showed no link between poor logic and a writer's subjective intent about whether the statements are true or not. Moreover, Dr. Habick's conclusion about whether a statement in the article was false seemed to rest not on any proven facts but rather on his personal "common sense," "common knowledge," and "verifiable reality."

Dr. Habick conceded that he knew of no peer-reviewed articles endorsing his method. No defamation cases were presented where a linguist had been qualified as an expert under *Frye* standards for using the Dr. Habick's process of analysis to establish whether a publisher had actual malice or to educate the jury as to how an average reader would interpret articles. Indeed, no evidence was provided that linguists generally accept Dr. Habick's assertion that a linguist need simply read articles and apply common sense and knowledge without any factual research or verification to assess whether an author knowingly wrote a false article or wrote one with reckless disregard for its truthfulness. Thus, the magical promise of crystal-ball-like insight into another's mental state through analysis of a person's writing failed to be backed by any generally accepted science.

An expert's knowledge must be beyond that possessed by the average layperson and be relevant to a question the jury must answer.

Experts must contribute knowledge that the jurors don't already have. Pa. R. Evid. 702(a) (expert's testimony is admissible only if it provides "scientific, technical, or other specialized knowledge" that "is beyond that possessed by the average layperson"). The law does not permit a party to package a witness as an expert to talk in confusing,

technical, or Latin language to tell a juror something that is already within the realm of common sense and general knowledge. "Expert testimony is permitted only as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman. Where the issue involves a matter of common knowledge, expert testimony is inadmissible." *Com. v. O'Searo*, 352 A.2d 30, 32 (Pa. 1976) (internal citations omitted). Dr. Habick's proffered testimony does not meet these requirements because average jurors are inherently qualified to read the articles as average readers without the aid of an expert, and because logical and linguistic structures are irrelevant to the question of whether false statements are knowingly or recklessly published as truth.

The Superior Court has recently held:

"Admissible expert testimony that reflects the application of expertise requires more than simply having an expert offer a lay opinion. Testimony does not become scientific knowledge merely because it was proffered by a scientist.' Likewise, expert testimony must be 'based on more than mere personal belief,' and 'must be supported by reference to facts, testimony or empirical data.'

. . .

The exercise of scientific expertise requires inclusion of scientific authority and application of the authority to the specific facts at hand. Thus, the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: the proffered expert testimony must

point to, rely on or cite some scientific authority-whether facts, empirical studies, or the expert's own research-that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion. When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief."

*Snizavich v. Rohm & Haas Co.*, 83 A.3d 191, 195 (Pa. Super. Ct. 2013) (internal citations omitted), *allocatur denied* July 29, 2014 (88 EAL 2014). Dr. Habick's testimony reflects his personal beliefs and, by his own admission, his common sense and knowledge. It does not provide specialized knowledge beyond what the average jury already possesses.

First, Dr. Habick's testimony was offered to provide insight as to what an average reader would conclude. A jury provides a perfect sampling of average readers. Dr. Habick's allegedly expert testimony provides nothing that the average jury does not have. Indeed, Dr. Habick testified that based on his extensive experience in linguistics, he lacks the ability to even read an article as an average reader would. Jurors are already endowed with the ability to read newspaper articles and need no expert assistance, especially from an expert like Dr. Habick who confesses that he can no longer read articles through the lens of an as average reader and that he rarely even reads the newspaper.

Second, Dr. Habick claims to use his linguistic analysis coupled with his "common sense," "common knowledge," and "verifiable reality" to tell the jury what the many reporters and the collective editorial board

must have thought when they wrote and published the articles he assumes to be false. Dr. Habick claims that he can determine in a scientific way that the defendants subjectively must have known or been reckless in not knowing that the articles they wrote were false. He claims to know this based on analyzing defendants' reporters' articles and their allegedly faulty argumentation, logic, and assumptions, coupled with his "common sense," "common knowledge" and "verifiable reality" that the articles are false. Jurors are known and valued for their "common sense" and "common knowledge"; having a so-called expert tell them what is common sense and common knowledge would be invading their province by purporting to provide them information that the average layperson already possesses. Average jurors also can assess the validity of arguments, logic, and assumptions without an expert, even though they may not be able to assign the proper Latin terminology to each type with quite the same practiced ease of a linguist like Dr. Habick.

Dr. Habick offers extensive critical commentary about the logical and linguistic structure of the articles in this case. However, there is no element of a defamation case that calls for a linguist's or logician's stamp of approval of the writing style. Dr. Habick's career has focused on trying to make test questions clear and unambiguous to prospective graduate student test takers, which is a noble and important task. However, defamation law is not about whether articles fall into this balanced style where rigorous rules are applied to ensure clear and uniform understanding. People may prefer that reporters write with clear logic and structure. However, reporters who may be perceived by some as not having that gift are not subject to legal liability for defamation. Moreover, opinions on

what constitutes good, clear writing vary as much as tastes in cuisine. Defamation law requires only that publishers and authors, whether logical or not, do not knowingly or recklessly publish false statements about public figures. Latin nomenclature, logical structure and linguistic style are irrelevant to a jury's ability to reach a conclusion on that straightforward issue.

Dr. Habick's testimony would be unfairly prejudicial, confusing and misleading to the jury.

Dr. Habick's proffered testimony does not meet minimal legal requirements for its admissibility. However, even if Dr. Habick's testimony did meet those standards, this Court finds that his testimony would be excluded under Pa. R. Evid. 403 as "its probative value is outweighed by a danger of...unfair prejudice, confusing the issues, [or] misleading the jury." *See, e.g., Betz v. Pneumo Abex LLC,* 44 A.3d 27, 52 (Pa.2012) (affirming that R. 403 gives the trial court a role in screening proffered experts to exclude unfair prejudice, confusion, and misleading evidence). Dr. Habick's testimony reaches into areas that the jury need not decide — (1) that of a so-called sophisticated linguistic analysis rather than an average juror's reading, and (2) that of a linguist speculating about his view as to the likelihood, based on no actual proven facts outside of the articles' written words, that the articles were written with knowledge of their alleged falsity or with reckless disregard of their alleged falsity. However, he confuses the definitions of defamation and actual malice. He uses overly technical vocabulary to discuss basic concepts. He makes assumptions that statements are false, which is a jury's task, and jumps to assessing whether the statements were published intentionally or recklessly as to whether they are false. Dr. Habick's testimony, if permitted and given the

imprimatur of being "expert" by the court, would unfairly prejudice, confuse and mislead the jury. By contrast, the jury will have far more information when they make their decision than Dr. Habick did in rendering his opinion that statements were defamatory. In addition to reading the articles, the jury will hear evidence including testimony from plaintiff, defendants, reporters and others who can provide evidence as to the true facts and the defendants' subjective intent. The jury will not be determining the publishers' subjective intent based on whether the articles are logical or include false assumptions. Jurors will be guided by whether there is evidence of actual malice.

## Conclusion

This court finds that Dr. Habick's testimony and report do not meet legal requirements under Pa. R. Evid. 702 and caselaw. Dr. Habick is not qualified in the areas he was offered for — namely, (1) to explain what the articles mean to the average reader, and (2) to show that Defendants knowingly published false statements or did so with reckless disregard of their falsity. *Sullivan*, 376 U.S. 254, 279-80 (1964). Plaintiff failed to show that Dr. Habick was qualified to testify in these areas, that his methodology was reliable or scientific and generally accepted within the field of linguistics, and that his testimony was relevant to the issues the jury would need to decide. Pa.R.Evid. 702.[6] Further, this court finds that Dr. Habick's testimony

---

6. *See also Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *Betz v. Pneumo Abex LLC*, 44 A.3d 27, 53, 58 (Pa. 2012) (clarifying court's gatekeeping role and explaining relevance of the breadth and character of an expert's extrapolations); *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1161 (Pa. 2010) (summary judgment is improper where an expert's conclusions are sufficiently supported); *Grady v. Frito-Lay*, 839 A.2d 1038 (Pa. 2003) (affirming that party proffering expert evidence must show that scientists in the field generally accept the expert's methodology for arriving at the expert's conclusion); *Trach v. Fellin*, 817 A.2d 1102,

is not admissible because it would be unfairly prejudicial, confusing and misleading. Pa.R.Evid. 403. For the foregoing reasons, Dr. Habick's testimony and report are not admissible and may not be used as evidence in support of plaintiff's response to the summary judgment motion nor at trial.

## ORDER

And now, this 1st day of August, 2014, upon consideration of plaintiffs *Frye* motion, all responses and replies thereto, and the *Frye* hearing[7] held on July 28, 2014, it is hereby ordered that the motion is denied.[8]

---

1113 (Pa. Super. Ct. 2003) (explaining meaning of "methodology").

7. After plaintiff filed Dr. Timothy Habick's report, defendants requested a *Frye* hearing. This court granted that request, and plaintiff thereafter submitted a *Frye* motion that argued in favor of the admissibility of Dr. Habick's evidence.

8. Plaintiff Carl Greene's proffered expert, Dr. Timothy Habick, submitted a report stating that, upon review and analysis of all of the allegedly defamatory articles, he concluded that the writing showed that the authors wrote with actual malice—reckless disregard for the falsity of their statements. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). This court finds, however, that Dr. Habick's testimony and report do not meet legal requirements under Pa.R.Evid. 702 for several reasons: because he is not qualified in the areas he was offered for—namely, (1) to explain what the articles mean to the average reader, and (2) to show that defendants exhibited a reckless disregard for the truth; because his methodology is not reliable or scientific; and because his testimony is not relevant to the issues the jury would need to decide. *See also Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *Betz v. Pneumo Abex LLC*, 44 A.3d 27, 53, 58 (Pa. 2012) (clarifying court's gatekeeping role and explaining relevance of the breadth and character of an expert's extrapolations); *Grady v. Frito-Lay*, 839 A.2d 1038, 1045 (Pa. 2003) (affirming that party proffering expert evidence must show that scientists in the field generally accept the expert's methodology for arriving at the expert's conclusion); *Trach v. Fellin*, 817 A.2d 1102, 1113 (Pa. Super. Ct. 2003) (explaining meaning of "methodology"). Even if Dr. Habick were qualified, his methodology reliable and his testimony relevant, this court finds his testimony would be excluded under Pa.R.Evid. 403 as "its probative value is outweighed by a danger of…unfair prejudice, confusing the issues, [or] misleading the jury." *See, e.g., Betz*, 44 A.3d at 52 (affirming that R. 403 gives the trial court a role in screening proffered experts to exclude unfair prejudice, confusion, and misleading evidence).

As a result of the *Frye* hearing, this court holds that the testimony and report of Dr. Timothy Habick is inadmissible because it does not meet legal requirements. This court found that Dr. Habick is not qualified in the areas offered, his opinion is not reliable or generally accepted by those in his field, and is not relevant to the issues the jury must decide. Therefore, Dr. Habick's testimony and report are hereby stricken from the record, and cannot be considered legally admissible evidence in this action, either at the summary judgment stage or at trial. (Pl.'s answer in opp'n to defs.' mot. summ. j. ex. L.) (*See* attached memorandum opinion).